In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-00-372 CR


____________________



LAGARY HARRISON, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 359th District Court


Montgomery County, Texas


Trial Cause No. 96-11-01599-CR






OPINION


 A jury convicted appellant of having committed aggravated sexual assault of a child,
M.S. The jury sentenced appellant to confinement in the Institutional Division of the
Texas Department of Criminal Justice for a term of forty-five (45) years, and further
assessed a fine of $10,000. This was appellant's second trial for the same offense as this
Court reversed his previous conviction. See Harrison v. State, No. 09-97-143 CR, 1999
WL 233409 (Tex. App.--Beaumont April 21, 1999, no pet.) (not designated for
publication). The offense date alleged was "on or about" May 6, 1995, with the victim
being ten years' old at that time. 

 Appellant is before us pro se, (1) and presents us with nine appellate issues. Appellant
groups these nine issues into three subparts. The first "grouping" contains the single
complaint that the record evidence is factually insufficient to sustain his conviction. The
second grouping consists of issues two through five essentially contending that he received
ineffective assistance of counsel at trial. The final grouping of issues, six through nine,
seems to complain of trial court error in "instructing" appellant's trial counsel to have his
witness clarify the word "prone" for the jury. 

 In conducting a factual sufficiency review, we begin with the presumption that the
evidence is legally sufficient under Jackson v. Virginia. (2) Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996). Thereafter, the reviewing court asks whether a neutral
review of all the evidence, both for and against the finding, demonstrates that the proof of
guilt is so obviously weak as to undermine confidence in the jury's determination, or the
proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. 
King v. State, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000) (citing Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000)) (Court of Criminal Appeals adopts the complete
civil factual sufficiency formulation.). In the instant case, we are presented with the type
of evidentiary review characterized by the Court of Criminal Appeals as "balancing scale." 
See Goodman v. State, 66 S.W.3d 283, 285 (Tex. Crim. App. 2001). 

 In Goodman, the Court analogized the "balancing scale" review for factual
sufficiency in the following manner:

 Here, there is evidence on both sides of the question. Some evidence
supports a positive inference, and some evidence supports a negative
inference. For example, suppose a modern-day Cretan Liar (3) testifies: "I
saw the defendant put the baggie of cocaine down on the sidewalk." 
Although the Cretan Liar has five prior perjury convictions, his testimony
is nonetheless legally sufficient to prove that the defendant possessed the
baggie. Direct evidence of "X" fact is always legally sufficient to support
a finding of "X" fact. See Calvert ["No Evidence" and "Insufficient
Evidence" points of Error, 38 TEXAS L. REV. 361 (1960)] at 363. The
Cretan Liar's testimony, standing alone, is also factually sufficient to support
the element of possession. If the jury believes him (and it is entitled to do
so under either a legal or factual sufficiency review), then the Cretan Liar's
testimony conclusively proves the point. (footnote omitted) 

 Now, suppose that the defendant calls a dozen boy scouts, who
uniformly testify that they definitely saw the baggie lying on the sidewalk
before the defendant came along and sat down. Now we have the Cretan
Liar's testimony (which the jury was entitled to believe and actually did
believe) set against the testimony of twelve boy scouts (whose testimony the
jury was entitled to reject and whose testimony, for whatever reason, it did
reject). Clearly, the jury's finding that the defendant possessed the baggie
of cocaine is against the great weight and preponderance of the evidence. 
The Cretan Liar, with multiple perjury convictions, versus twelve boy
scouts? (footnote omitted) Given this state of the evidence, the jury's verdict
is "clearly wrong" and "manifestly unjust." A reviewing court can only
attribute the verdict to bias, irrationality, or some other peculiarity.


Id. (emphasis in original). 

 From the whimsical example set out above, it would appear that a proper factual
sufficiency review will encompass a quantitative analysis of the evidence (total amount of
evidence presented by each party on a particular fact at issue), as well as a qualitative
analysis of the evidence. Additionally, as part of the qualitative analysis, the reviewing
court is to apparently make an independent assessment of any objective indicators of
credibility for each fact-witness called to testify. As the Court noted in Goodman, "[T]he
next practical issue is how many boy scouts does it take to make a verdict based on the
testimony [of] a multiple perjurer 'clearly wrong' and 'manifestly unjust'? . . . At some
point, the reviewing court necessarily exercises its subjective judgment." Id. at 286 n.5. 
 In the instant case, the State called a total of six witnesses during the guilt/innocence
phase. These included the victim [M.S.]; the records' custodian of the hospital where
M.S. was medically examined; (4) a registered nurse who specialized in adult and pediatric
sexual assault examinations; (5) the victim's cousin who also happened to live in an apartment
directly across from appellant at the time the offense occurred; (6) the victim's mother; (7) and
finally, as a rebuttal witness, Detective Carl Jones of the Willis Police Department. 
Furthermore, the State introduced three items of "physical" evidence: State's Exhibit 1-A,
the medical records of the examination of the victim which took place approximately one
month after the alleged date of the offense; State's Exhibit 4, a copy of the voluntary
statement appellant provided to Detective Jones on June 21, 1995; and State's Exhibit 5,
a certified copy of a judgment and sentence out of Harris County indicating appellant's
conviction for misdemeanor theft in March of 1991. 

 The State's case essentially consisted of the victim, M.S., describing the events of
the afternoon and evening of May 6, 1995, as she spent the night at the apartment of her
class-mate, T.G., who happened to be appellant's step-daughter. At one point during the
evening, M.S. recalled that she, T.G., appellant, and appellant's wife, Sheila, were all
watching a movie in the living room. For some reason, T.G. left the room leaving M.S.
lying on the floor watching the television with appellant sitting on a loveseat to her left,
and Sheila lying on the couch behind M.S. and out of M.S.'s view. During this time,
M.S. was apparently lying on her stomach. M.S. then described how appellant slid his
foot between M.S.'s body and the floor "below [her] waist." When M.S. repositioned her
body in an apparent attempt to escape this contact, appellant also moved. M.S. then stated
that appellant got down on the floor, pulled down M.S.'s pajama shorts and her
underwear, and inserted his penis inside her "vaginal area." M.S. further testified that
appellant told her to "move with him." While M.S. could not remember if her "bottom"
was tilted off of the ground or not during the sexual assault, she did remember that it hurt,
that she felt some "slimy stuff" on her "back side," that she went to the bathroom to clean
herself, and then went to T.G.'s room and cried. M.S. went home the next morning and
did not report the sexual assault until approximately one month later. 

 In the case for the defense, appellant called nine witnesses including himself.
Appellant's one exhibit consisted of a drawing made by the victim during her cross-examination depicting the locations of appellant, appellant's wife and the victim in
appellant's living room at the time the sexual assault occurred. Of the eight witnesses
called during the case-in-chief for the defense (we exclude appellant), six were related to
appellant by either blood or marriage; (8) one was a former neighbor; (9) and the remaining
witness was Dr. Gerald Bullock, appellant's medical expert. Appellant's defense consisted
essentially of a two-pronged attack, viz: (1) an alibi for the May 5-7, 1995, weekend to
the effect that appellant, his wife, and his daughter spent the entire weekend in Houston
at his aunt's [Ruth Manning] apartment celebrating his aunt's 49th birthday; and (2) the
only time the victim, M.S., ever spent the night at appellant's apartment took place in
September of 1994 following a day spent in Montgomery, Texas, at a family reunion. 

 Because the jury is the sole judge of the facts, we must give deference to jury
findings. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). What weight to
give contradictory testimonial evidence is within the sole province of the jury, because it
turns on an evaluation of credibility and demeanor. Id. at 408-09. We are not free to re-weigh the evidence and set aside a jury verdict merely because we feel that a different
result is more reasonable. Id. at 407. We cannot reverse the verdict if reasonable minds
could differ about the conclusions to be drawn from the evidence. Richardson v. State,
973 S.W.2d 384, 387 (Tex. App.--Dallas 1998, no pet.). We find the evidence factually
insufficient only where necessary to prevent manifest injustice. Cain, 958 S.W.2d at 407. 
A decision is not manifestly unjust merely because the jury resolved conflicting views in
favor of the State. Id. at 410. Additionally, a decision is not manifestly unjust merely
because the defense has presented a reasonable alternative hypothesis. See Ates v. State,
21 S.W.3d 384, 391 (Tex. App.--Tyler 2000, no pet.); Richardson, 973 S.W.2d at 387. 
 In the instant case, we are presented with two diametrically opposed factual
scenarios for what took place the weekend of May 5-7, 1995. Furthermore, all of the
witnesses who are testifying to the events of that weekend are testifying from memory. 
We have no absolutely verifiable objective evidence proving the whereabouts of any of the
parties or any of the witnesses on that weekend. (10) That being the case, our factual
sufficiency analysis is strictly limited to that evidence which can be fully determined from
the cold appellate record. Johnson, 23 S.W.3d at 8. If there is no or little such evidence,
then we must defer to the jury's determination as to what weight to give the contradictory
testimonial evidence because such a determination often turns on an evaluation of
credibility and demeanor of the witnesses, and the jury was in attendance when the
testimony was delivered. Id. 

 In the instant case, all of the witnesses were fully identified for the jury so that any
potential biases and/or prejudices, either for or against appellant or the victim, provided
a context for the jury to weigh said testimony. Appellant took the witness stand and was
impeached by evidence of a prior theft conviction. Furthermore, an examination of
appellant's testimony indicates that he may have been his own worst witness as he comes
across as purposefully evasive, and quite argumentative. 

 Applying the law to the facts in the instant case, we cannot say that the proof of
guilt is greatly outweighed by contrary proof from appellant or his witnesses. The jury
heard the case for the State as well as the case for the defense. Both sides had substantial
fact witnesses who were also shown to the jury to be "interested" witnesses as well. The
jury chose to believe the State's witnesses over appellant and his witnesses. The jury
observed the demeanor of each witness and could hear the inflections in their verbal
responses. From this, the jury was able to assess the credibility of the witnesses far better
than a reviewing court relying solely on the "cold record." We find, therefore, that the
record contains factually sufficient evidence to support the jury's verdict. Issue one is
overruled. 

 Issues two through five contend trial counsel provided ineffective assistance to
appellant. The State's brief correctly sets out the proper standard for reviewing claims of
ineffective assistance as announced in Strickland v. Washington, 466 U.S. 668, 104 S.Ct.
2052, 80 L.Ed.2d 674 (1984). It is appellant's burden to show by a preponderance of the
evidence both that trial counsel performed deficiently at trial, and that the deficient
performance prejudiced the defense. Id. at 687, 104 S.Ct. 2064, 80 L.Ed.2d at 693;
Mitchell v. State, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). 

 In attempting to decipher appellant's brief on these issues, he appears to focus on
two alleged deficiencies of trial counsel. First, appellant contends that his entire defense
was prejudiced by his trial counsel's failure to "impeach" the victim, M.S., with testimony
of the physician's assistant from the previous trial. However, the record before us does
not include any transcribed testimony from the prior trial. At any rate, the record before
us indicates that one of the defensive strategies of trial counsel was to show that if the
victim was lying on the floor with her stomach down, as she testified, and her hips were
not elevated, vaginal penetration by appellant's penis would have been very difficult or
"extremely unlikely." This was one of the more salient points brought out by the
testimony of Dr. Bullock, appellant's expert witness. Having failed to impress a prior jury
with its ability to "impeach" M.S.'s testimony, trial counsel certainly could not be faulted
in any way for choosing to forego that line of inquiry in favor of attempting to convince
the present jury that penetration could not have been accomplished if M.S. was positioned
on the floor as she testified. This was certainly very sound trial strategy. 

 The second "deficient" incident involved the so-called "instruction" by the trial
court with regard to having Dr. Bullock explain the word "prone" to the jury. Appellant
also throws in a complaint that this was an improper communication with the jury in
violation of Tex. Code Crim. Proc. Ann. art. 36.27 (Vernon 1981). We reproduce the
pertinent portion of the record so as to place the issue in its proper perspective:

 Q.[Trial Counsel] You, of course, have never examined - - personally
examined [M.S.], have you?


 A.[Dr. Bullock] No, sir.


 Q. And you're going only on the medical records that I have supplied to
you, a copy of which you have in front of you now; is that right?


 A. Yes.


 [Trial Counsel]: May I have just a minute, Judge.


 THE COURT: Yes, sir. Might I ask that counsel approach the bench
here together.


 (At the Bench, on the record)


 THE COURT: Before we get this jury back there arguing over what
the word "prone" means, it is very reasonable that this case got reversed the
last time, would you clarify what you meant when you told the doctor "lying
prone" to mean, flat on your stomach, or whatever you had in mind when
you - - 


 [Trial Counsel]: Yes, sir.


 THE COURT: - - asked that question?


 [Trial Counsel]: Yes, sir.


 THE COURT: I'd appreciate it very much.


 [Trial Counsel]: Yes, sir.


 THE COURT: Thank you.


 (Open court, defendant and jury present)


 [Trial Counsel]: May we have just another minute please, Judge.


 THE COURT: Yes. 


 (Pause)


 . . . .


 Q.[Trial Counsel] Okay. When we talked before, you indicated - - let me
strike that. With regards to the records that you were able to review, did
those records indicate that the alleged victim was lying in a prone position?


 A.[Dr. Bullock] The medical record - - let me refresh my memory just a
minute. The medical record doesn't say that she was prone. Not the
medical record.


 Q. Okay. Does the medical record make any reference one way or the
other whether or not she was prone?


 A. No, it doesn't say she was and it doesn't mention it at all.


 Q. When I use the word "prone," would you explain to the jury what you
mean technically when we talk about or use the word "prone"? [sic]


 A. Prone simply means lying flat on your stomach.


 Q. And that would be without the buttocks being elevated?


 A. Yes, sir, that would not be that.


 Initially, we reject appellant's attempt to equate the events set out above with a
violation of article 36.27. The trial court was clearly not attempting to communicate with
the jury. The trial court simply requested trial counsel to have the witness clarify the word
"prone" for the jury. The trial court did not define the word, nor try to impose its
definition of the word upon either the parties or the jury. Additionally, trial counsel was
not ineffective for failing to object to the trial court's request in that the explanation of the
word "prone" provided to the jury by Dr. Bullock was consistent with trial counsel's
apparent strategy to convince the jury that, because the victim was "lying flat on [her]
stomach," her vagina could not have been penetrated by appellant attempting to enter her
from behind. We find absolutely no deficient performance by trial counsel from
appellant's issues two through five, and they are overruled. 

 Issues six through nine continue with the complaint that the trial court's
"instruction" to trial counsel to have Dr. Bullock define "prone" was "an improper
comment on the weight of the evidence;" was "an improper instruction on a factual
matter" in violation of both the United States Constitution and the Texas Constitution; and
was a violation of articles 36.14, 36.15, 36.16, and 36.27 of the Code of Criminal
Procedure. 

 It appears from a careful reading of the "Argument and Authorities" portion of
appellant's brief on these final issues that he is making a not-so-veiled attempt to secure
a reversal by making the same "analysis" and by using the same authorities this Court used
to find reversible error in his first trial. See Harrison, No. 09-97-143-CR, 1999 WL
233409, at *3-*4. However, as the record clearly indicates, the trial court did not provide
the jury with a written definition of the word "prone," as was done in the first trial. There
was no communication between the trial court and the jury at all with regard to the word
"prone" or its meaning. Dr. Bullock's testimony of his understanding of the word's
meaning was subject to cross-examination, and further subject to having the State's expert
provide her own definition. 

 At any rate, there was absolutely no verbal or written communication from the trial
court to the jury with regard to the word "prone." Because no communication took place,
there could be no possible "comment on the weight of the evidence" by the trial court. 
Furthermore, the jury in the instant case did not send out any notes during its
deliberations. Again, no communication took place between the trial court and the jury. 
 Lastly, the witness whose testimony was in dispute in the prior trial, which
prompted the trial court to provide the jury with the erroneous supplemental instruction,
did not testify in the instant trial. In the instant case, the trial court wisely reminded the
parties to clarify the word for the jury in hopes of avoiding any confusion during
deliberations. As noted above, trial counsel's eliciting from Dr. Bullock his meaning of
the word was consistent with counsel's strategy that, in the "prone" position as M.S. had
previously testified, it would have been extremely difficult for appellant to place his penis
into M.S.'s vagina. For all of these reasons, we overrule issues six through nine. 

 Having overruled all of appellant's issues, we affirm the judgment and the sentence
of the trial court.

 AFFIRMED. 


 PER CURIAM


Submitted on May 31, 2002

Opinion Delivered June 19, 2002

Do Not Publish 


Before Walker, C.J., Burgess and Gaultney, JJ.
1. On July 27, 2001, appellant filed with us a petition to dismiss his court-appointed
appellate counsel and a request to proceed pro se. We subsequently abated the appeal and
remanded the cause to the trial court to conduct a hearing pursuant to Faretta v.
California, 422 U.S. 806, 836, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The trial court
conducted a hearing and rendered a finding that appellant desired to proceed pro se, and
permitted appellate counsel to withdraw. We concurred and issued an order to that effect,
and reinstated the appeal. 
2. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
3. The Court provided the following footnote at this point: 

 History credits Epimenides, a 6th century B.C. philosopher,
for introducing the semantical paradox known as the Cretan
Liar. Epimenides, himself a Cretan, reputedly asserted, "All
Cretans are liars." If all Cretans are indeed liars, as
Epimenides says, then Epimenides himself must be lying when
he states that all Cretans are liars. 
4. This witness was Christine Johnson.
5. This witness, Alice Quartermous, did not physically examine M.S., but did the
initial triage of M.S. and later reviewed the examination records generated by the
emergency room physician and physician's assistant who conducted the physical
examination of M.S. on June 19, 1995. 
6. This witness was Tiffany Morris.
7. This witness was Chitquitta Renee Spears.
8. These included Ruth Manning, appellant's aunt; Curtis Gilford, appellant's brother-in-law; Craig Butler, appellant's first cousin; Billy Gene Harrison, appellant's brother;
Amber Gilford, appellant's niece; and Sheila Harrison, appellant's wife.
9. This was the witness Markeesha Shepherd.
10. By "absolutely verifiable objective evidence" we mean some sort of unbiased,
business-type records indicating a particular individual was located at a particular place on
a certain date and time, such as records from a hospital or the book-in facility at a
municipal or county jail.