**William HARRIS, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 06–02–00176–CR.**

Court of Appeals of Texas,
Texarkana.

Submitted Sept. 26, 2003.

Decided Feb. 18, 2004.

Terrence Gaiser, Houston, for appellant.

William J. Delmore, III, Harris County Dist. Atty., Alan Curry, Asst. Dist. Atty., for State.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

A jury found William Harris guilty of murdering his estranged wife, Wenona[1] Lynn Harris, and assessed punishment at sixty-five years' imprisonment and a $10,000.00 fine. Harris raises three points of error on appeal: (1) factual sufficiency; (2) the admission of hearsay evidence; and (3) the trial court's failure to hold a hearing on the admissibility of expert testimony. We affirm the judgment.

## I. Factual Sufficiency

In his first point of error, Harris challenges the factual sufficiency of the evidence. Harris contends a reasonable alternative hypothesis exists that "is congruent with the evidence and explains appellant's actions." He then suggests that, when examining the factual sufficiency of the evidence, "it is instructive to remove the hypothesis urged by the State and to examine the remaining evidence." Then, after conducting such a review, Harris urges us to conclude "[i]t would be manifestly unjust to uphold [his] conviction on the basis of evidence that can lead to the reasonable conclusion appellant did not commit the offense."

### A. The Standard of Review and the "Alternative Hypothesis Analytical Construct"

The Texas Court of Criminal Appeals has never formally approved the "alternative hypothesis analytical construct" as it relates to *factual* sufficiency claims. In *Geesa v. State*, 820 S.W.2d 154, 159 (Tex. Crim.App.1991), *overruled on other grounds, Paulson v. State*, 28 S.W.3d 570 (Tex.Crim.App.2000), the Texas Court of Criminal Appeals expressly disavowed the "reasonable hypothesis analytical construct" for *legal* sufficiency reviews. The Texas Court of Criminal Appeals next discussed the doctrine in *Wilson v. State*, 7 S.W.3d 136, 141 (Tex.Crim.App.1999), but noted Wilson had failed to cite any alternative hypothesis in his brief. The court then conducted a traditional factual sufficiency review, found there to be no "evidence of significant value exculpating appellant from the murder," and held appellant's conviction was not "against the overwhelming weight of the evidence." *Id.* at 142.

Several intermediate appellate courts of this State have expressly approved use of the alternative hypothesis analytical construct within the framework of a factual sufficiency review. In *Richardson v. State*, 973 S.W.2d 384 (Tex.App.-Dallas 1998, no pet.), the Fifth Court of Appeals noted that *Geesa*'s rejection of the "reasonable hypothesis analytical construct" preceded the Texas Court of Criminal Appeals' adoption of a factual sufficiency review standard in *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App.1996). The Dallas court then recognized that, because *Clewis* requires a factual sufficiency analysis to consider *all* available evidence, an appellate court's analysis must include consideration of a reasonable alternative hypothesis. Nonetheless, the Fifth Court quickly warned that an appellate court

---

1. At trial, witnesses referred to the victim by several different names. Her mother and sister called her "Weewee." The victim's coworkers and boyfriend called her "Lynn." The indictment reads "Wenona." To avoid confusion, we will refer to the victim as "Wenona."

"cannot reverse the verdict if reasonable minds could differ about the conclusions to be drawn from the evidence." *Richardson*, 973 S.W.2d at 387. "A verdict may be overturned only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." [2] *Id.* Ultimately, the *Richardson* court found that ample evidence supported Richardson's conviction, such that the jury's verdict was not manifestly unjust or against the great weight of the evidence. *Id.*

In *Warren v. State*, 91 S.W.3d 890 (Tex. App.-Fort Worth 2002, no pet.), the Second Court of Appeals acknowledged that the standard for reviewing factual sufficiency is the same in both direct and circumstantial cases: the reviewing court examines all the evidence in a neutral light and weighs the evidence both for and against the verdict. *Id.* at 892. The Second Court found there was sufficient evidence to exclude Warren's alternative hypothesis that his brother, rather than Warren himself, committed theft by passing worthless checks written on Warren's account. *Id.* at 896. The Fort Worth court then affirmed Warren's conviction.

In *Ates v. State*, 21 S.W.3d 384 (Tex. App.-Tyler 2000, no pet.), the Twelfth Court of Appeals adopted *Richardson*'s analysis for reviewing factual sufficiency when the appellant raises a reasonable alternative hypothesis. "Because we consider all of the evidence in conducting a factual sufficiency review, we necessarily consider any reasonable alternative hy-

potheses raised by the evidence." *Id.* at 391 (citing *Richardson*, 973 S.W.2d at 387). And, like the Fifth Court's opinion in *Richardson*, *Ates* acknowledged that mere existence of a reasonable alternative theory did not automatically render the evidence insufficient. *Id.* (citing *Richardson*, 973 S.W.2d at 387). Weighing the evidence proving Ates' guilt in the murder charge against the evidence disproving guilt, the Twelfth Court held the jury could have disregarded Ates' evidence regarding the other possible murder suspect as weak and unpersuasive. *Id.* at 392–93. Accordingly, the Twelfth Court affirmed Ates' conviction. *Id.*

■ We now turn to the case before us. The State cites our decision in *White v. State*, 58 S.W.3d 183 (Tex.App.-Texarkana 2001, no pet.), as precedent that "this Court has [previously] refused to utilize the reasonable hypothesis test in reviewing a challenge to the factual sufficiency of the evidence." In a combined, single point of error, the appellant in *White* challenged both the factual and legal sufficiency of the evidence.[3] *Id.* at 186–87. Analyzing both issues under a single section of analysis, we stated that the "other reasonable hypothesis" test is no longer used and cited *Brown v. State*, 911 S.W.2d 744 (Tex. Crim.App.1995), and *Roberts v. State*, 963 S.W.2d 894, 898 (Tex.App.-Texarkana 1998, no pet.), for support. Like *Geesa*, *Brown's* rejection of the alternative hypothesis analytical construct predates the

---

**2.** More recently, the Texas Court of Criminal Appeals held that an appellate court's hesitancy to overturn a verdict as factually insufficient finds firm roots in the maxim that the jury's determination of fact should be shown great deference and respect. *Johnson v. State*, 23 S.W.3d 1, 12 (Tex.Crim.App.2000).

**3.** The practice of combining two or more separate issues into a single point of error is strongly discouraged, as it often results in the

combined point of error being overruled as multifarious. *See, e.g., Foster v. State*, 101 S.W.3d 490, 499 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (three separate issues combined into single point of error ruled inadequately briefed and multifarious); *Parra v. State*, 935 S.W.2d 862, 875 (Tex.App.-Texarkana 1996, pet. ref'd) (point of error brought under both state and federal bases overruled as multifarious).

Texas Court of Criminal Appeals' opinion in *Clewis*. Moreover, Judge Meyers' opinion in *Brown* focused on *legal* sufficiency within the context of a circumstantial evidence case. *Brown*, 911 S.W.2d at 744–49. In *Roberts*, 963 S.W.2d at 897–99, we examined the factual and legal sufficiency of the evidence to affirmatively link the appellant to over 400 grams of cocaine. We did not disavow the applicability of the reasonable hypothesis analytical construct within a factual sufficiency review; instead, we found that the affirmative links between the appellant and the drugs "need not be so strong that it excludes every other reasonable hypothesis except the defendant's guilt" as long as the circumstantial evidence provided "adequate affirmative links between Roberts and the cocaine," and we held the evidence did so provide. *Id.* at 898, 899. Accordingly, in contrast to the State's contention, we do not read our precedent to foreclose consideration of Harris' point of error under *Richardson* 's alternative hypothesis analytical construct. Consideration of a reasonable alternative hypothesis is consistent with the scope of our duty to review all the evidence in a neutral light during a factual sufficiency review. Such an analytical construct has not been forbidden by the Texas Court of Criminal Appeals, and it is not inconsistent with this Court's own jurisprudence.

■■■ However, asking us to ignore the State's hypothesis and examine only part of the evidence—as is now urged by Harris in the case before us—is not the proper standard under which to review factual sufficiency. We are required to examine *all* the evidence in a *neutral* light. *Clewis*, 922 S.W.2d at 129. As the Dallas Court of Appeals explained in *Richardson*,

> a reviewing court conducting a factual sufficiency analysis necessarily considers any reasonable alternative hypotheses

raised by the evidence. The very nature of a factual sufficiency review requires the court to consider *all* of the evidence presented at trial and not just that which is favorable to the verdict. Therefore, if the evidence suggests the existence of a reasonable alternative hypothesis, the court cannot ignore it and still properly perform the analysis required under *Clewis*. However, the mere existence of an alternative reasonable hypothesis does not render the evidence factually insufficient.... [E]ven when an appellant identifies an alternative reasonable hypothesis raised by the evidence, the standard of review remains the same. A verdict may be overturned only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

973 S.W.2d at 387 (citation omitted); *see also Ates*, 21 S.W.3d at 391. We decline Harris' invitation to apply a different standard of review. *Cf. Swearingen v. State*, 101 S.W.3d 89, 97 (Tex.Crim.App.2003) (view *all* evidence, both for and against jury's verdict); *Goodman v. State*, 66 S.W.3d 283, 285–86 (Tex.Crim.App.2001) (factual sufficiency review involves balancing all evidence, i.e., weighing testimony of Cretan Liar against that of one or more boy scouts).

## B. The Indictment and Evidence

The indictment charged Harris with murdering Wenona by strangulation. A person commits murder when he or she intentionally or knowingly causes the death of another person. Tex. Pen.Code Ann. § 19.02(b)(1) (Vernon 2003). The case against Harris was based on circumstantial evidence; no one who testified saw Wenona killed. It is the circumstantial evidence that Harris contends is factually insufficient.

The evidence, viewed in a neutral light, shows the following: Police found a wom-

an's body on the early afternoon of Sunday, March 4, 2001. The body was located behind a trash dumpster near the former headquarters of the old Dryper's diaper corporation in north Houston. The body was that of a black female, not wearing shoes, her belt undone, and her pants partially unzipped. Police found no blood around the body. The woman was ultimately identified as Wenona Harris.

Roger Milton, M.D., an assistant medical examiner at the Harris County Medical Examiner's office, performed the autopsy. He concluded Wenona died as a result of strangulation.

Before her death, Wenona lived in Texas City, Texas. Rashand Malvo was Wenona's neighbor at the Lakewood Apartments. Malvo testified he believed Wenona lived in her apartment with her son and Harris. Malvo stated he saw Harris leave Wenona's apartment between 11:30 and 11:40 a.m. Saturday, March 3, 2001. A few moments later, Malvo saw Harris again, this time as he was being shown around the apartments by a leasing agent. Malvo also testified he remembered Harris drove a black Lincoln Navigator sport utility vehicle.

Evangeline Blevins, a leasing agent who worked at the Lakeview Apartments at the time of Wenona's murder, testified she showed an African–American male around the complex Saturday, March 3, 2001. At trial, Blevins could not independently remember the name of the man to whom she had shown the apartment, but did identify the person shown on Harris' driver's license as the same person to whom she had

shown the apartment.[4] That man had specifically asked to see apartment number 1808, located next door to Wenona's apartment. Eventually, the man left a deposit check with Blevins for apartment number 1808. That deposit check—admitted into evidence at trial—was drawn on a bank account belonging to "William Harris." On Monday, March 5, 2001, Blevins received a call from the man to whom she had leased apartment 1808; he said he no longer wanted the apartment.

Misty and Betty Leiber testified they had driven to the Lakeview Apartments in Texas City to pick up a friend for lunch Saturday, March 3, 2001. They arrived between 2:30 p.m. and 3:00 p.m. While they waited for their friend, both observed an African–American male coming down the walkway in front of their friend's apartment. (Betty testified she thought the man was approximately six feet tall.)[5] Both Misty and Betty initially thought the man was doing laundry because they observed him carrying what looked like a big bundle of laundry inside either sheets or a large comforter over his right shoulder. But as they watched the man, Misty and Betty saw a human arm extend from the bundle. Through the linens, Betty and Misty thought they saw a body clothed in a dark-colored or striped shirt.[6] Misty believed the arm was that of "either a small black woman or a bigger child that was Hispanic or black, . . . ." Betty described the arm as thin and darkly tanned. "It could have been like a light-skinned black person or Mexican. I couldn't really tell."

4. According to Blevins' testimony, the man claimed he was renting an apartment on his mother's behalf. Before showing the apartment, Blevins made a photocopy of the man's driver's license. That photocopy was introduced into evidence at trial. The photocopy showed Harris' driver's license.

5. The photocopy of Harris' driver's license lists Harris' height as five feet, eleven inches.

6. The jury had already seen police photographs of Wenona, showing her clothed in a dark-colored shirt at the time police found her body.

Betty also said she believed the arm was that of either a woman or a child.

Misty saw the man put the bundle into a vehicle she described as a dirty, black sport utility vehicle. Before the SUV sped away from the scene, Misty wrote down the SUV's license plate number, 4TPJ44. Misty said she saw "the back of the [body's] head hit the window with the arm up" when the man put the body into the SUV. "But he [the driver] pulled it [the arm] down to where it wasn't there anymore." At trial, Misty identified Harris as the man she had seen carrying what she thought was a body wrapped inside the sheets or comforter. Betty, however, was unable to identify Harris, during either a lineup at the police station or later at trial, as the man she saw carrying the bundle.[7] But when asked repeatedly at trial, Betty was certain she never saw a child with the man who she had seen carrying the body and who drove away in the black SUV.

Misty and Betty went to lunch, then went to the Texas City Police Department to report the suspicious activity they had observed earlier at the Lakewood Apartments. The next day, someone from the police department followed up on Betty's and Misty's information. At that time, Misty gave Officer Brian Goetscheius the piece of paper on which she had written the black SUV's license plate number. This paper was later admitted into evidence. The paper shows a handwritten notation of "4tP J44."

Sergeant Robert Elliot of the Texas City Police Department testified a man named "William Harris" was the registered owner of a black Lincoln Navigator SUV with license plates 4TPJ44. Elliot also told the jury about his search of Harris' SUV. Using Luminol,[8] Elliot found evidence of blood on the floor mats. He collected the floor mats and submitted them to the forensics laboratory of the Houston Police Department for further testing. Elliot, however, did not know whether the floor mats ever received further testing at the Houston Police Department. Regardless, the State presented no evidence of such an analysis.[9] Elliot also found no evidence of the victim's hair or fingerprints inside Harris' SUV.

At 4:00 p.m. Saturday afternoon, Harris took his son Jyron to Lucy Smith's home in Galveston.[10] Harris left Jyron in Smith's care.[11] Smith said Harris told her the following morning he had gone to Houston to drop something off. Later that day, Smith and Jyron went to eat with Cardena Fontenette (Smith's daughter) at a local restaurant. Smith told the jury she did not believe Harris had been behaving

---

7. Houston attorney Michael Charlton was present during the pretrial lineup proceedings. He testified neither Betty nor Misty were initially able to identify Harris as the person they saw carry a body to a black Lincoln Navigator on March 3, 2001. He did acknowledge, however, that Misty eventually identified the man in position number two, Harris, as the person most closely resembling the body type of the man she saw in the apartment complex. Charlton did not consider this to have been a positive identification of Harris as the suspect.

8. Luminol is a substance that reacts to the presence of blood, making blood which is otherwise invisible to the naked eye, visible. *Ex parte Mowbray*, 943 S.W.2d 461, 463 (Tex. Crim.App.1996).

9. Luminol testing is not accepted as a positive testing for blood. *Mowbray*, 943 S.W.2d at 463. Luminol testing merely establishes a presumption that blood is present. Luminol also reacts to the presence of substances other than blood. *Id.*

10. Jyron is the son of Harris and Wenona.

11. Smith is the great aunt and primary caregiver of Harris' other son, William. The younger William is not related to Wenona.

unusually during the weekend Wenona was killed.

Fontenette testified Harris came to see her at work the afternoon of Sunday, March 4, 2001. Harris arrived in his Lincoln Navigator and asked to use Fontenette's vehicle. Harris said he needed to go to Galveston and see what was happening regarding Wenona. He also told Fontenette he had a warrant out for his arrest. Fontenette allowed Harris to exchange his Navigator for her car, as it had been their custom to share vehicles in the past.

Harris left, but later used his cell phone to call Fontenette. During that call, Fontenette informed Harris that the police were looking for him at his home and that Harris should go speak with them. Harris told Fontenette he would talk to the police. Fontenette then went to Galveston, picked up Jyron, and took him to the police station. Fontenette then left the Lincoln Navigator at a friend's home.

At trial, Fontenette said Harris had told her that he had been to the casino in Louisiana Saturday night and that, based on his physical appearance, she believed the story was consistent with his physical appearance. She also said Harris had consistently denied being involved in Wenona's death.

Another witness, Mary Jackson,[12] testified that, before Valentine's Day 2001, Harris told her he was going to ask one of the deputy sheriffs to lock him up so he would not be able to harm Wenona. Jackson later found out Harris admitted himself to the psychiatric unit of a hospital because he was having homicidal thoughts.

Ifeoma Arena, M.D., a resident in psychiatry at the University of Texas Medical Branch (UTMB) in Galveston, interviewed Harris February 12, 2001, when he admitted himself to that facility. Harris told

Arena he had been having thoughts of killing Wenona by strangulation or by shooting her with a gun. He said he could snap at any time. He also told Arena he spent most of his day following Wenona, watching her, and checking on where she was going. Harris was upset that Wenona had a new boyfriend. Arena recalled Harris saying he had a key to Wenona's apartment. Even though Harris presented no acute psychosis, Arena admitted Harris for depression and further evaluation. Harris' medical records, admitted into evidence without objection, indicate he was admitted to the psychiatric unit for "suicidal and homicidal precautions."

Vanessa Vela, M.D., another psychiatry resident at UTMB–Galveston, saw Harris February 13, 2001. Harris saw Vela and her team (including two medical students and a faculty physician) and seemed "mildly distressed." Harris stated he admitted himself to the hospital the previous day due to concerns about (1) his pending divorce; (2) the fact his wife was dating another man; and (3) thoughts of arming himself and hurting his wife. But on February 13, 2001, Harris reported he was no longer having those thoughts. Vela stated the overnight change in Harris' demeanor was consistent with her experience: "a lot of patients, once they are in the safety of the hospital, they do realize these thoughts are irrational and they are able to kind of think things through in a quiet, structured environment a long time." Harris' change was not the result of having been administered any medication. Vela concluded, based on her observations, the patient interview, and Harris' psychiatric history, that Harris was not psychotic. He appeared intelligent, articulate, capable of conversing, completely rational, and able to understand Vela's questions. When

---

**12.** Jackson is Wenona's aunt.

Vela told Harris that his soon-to-be ex-wife was not interested in being a part of his psychiatric treatment, Harris said he was disappointed. Vela prescribed Paxil for Harris' treatment. According to Vela, Paxil usually takes four to six weeks to take effect and does not work for everyone. Harris then checked out of the hospital.

When Jackson found out Harris had left the hospital, she called Wenona to warn her because Jackson feared "he [Harris] might try to hurt her [Wenona]."

Testifying before the jury, Lashuana Hampton [13] described Wenona as a woman with a thin build and a lighter skin complexion.[14] Hampton testified about several incidents of family violence in which Harris injured Wenona. These injuries included a black eye, bruises on Wenona's arms, and marks on Wenona's neck and back where Harris had scratched her. Hampton also told the jury that Harris had previously choked Wenona until she passed out and that he had struck her with a telephone.

Wenona had called Hampton during the early morning of Saturday, March 3, 2001. Wenona wanted to bring Jyron to stay with Hampton. She arrived at Hampton's house around 8:00 a.m., and Jyron stayed with Hampton until around 12:50 p.m. when Wenona returned to pick up Jyron. At that time, Wenona was wearing a dark brown or dark black shirt made of stretchy material. Hampton, Hampton's husband, and Wenona then took a table to Wenona's apartment. Hampton left Wenona's apartment around 2:00 p.m., when Wenona planned to take a bath. Hampton later returned to Wenona's apartment and knocked on the door, but neither Jyron nor Wenona answered. Hampton waited

approximately ten minutes, but no one answered the door during that time. She called Wenona's home telephone number around 4:00 p.m. and again at 10:00 p.m., but received no answer.

The victim's mother, Norsie Young, testified she last spoke with Wenona at 12:52 p.m. Saturday, March 3, 2001. Young and Wenona had agreed to join other family members later that evening to celebrate Wenona's twenty-ninth birthday. At 2:49 p.m., Harris called Young to tell her he was taking Jyron to Cardena's house and then heading to Coushatta, Louisiana, to gamble.

Wenona never arrived at the family celebration that evening. Young and Wenona's other family members became concerned about Wenona's unexplained absence and began searching for her. Young and her son went to Wenona's apartment that evening, but found neither Wenona nor Jyron, and they found no signs of a struggle at the apartment. Young, however, believed it was strange that her daughter's car was still parked in the parking lot when Wenona was not at home.

Young called Harris Sunday morning regarding Wenona's disappearance. Harris denied knowing Wenona's whereabouts. Young later called Harris a second time and told him the police were looking for him because two of Wenona's neighbors had seen Harris allegedly carrying Wenona, wrapped in a sheet, from her apartment when Wenona's arm protruded from the sheet. According to Young's testimony, Harris denied being at Wenona's apartment, questioned whether the neighbors had actually seen Harris at Wenona's apartment, and eventually agreed to meet

---

13.  Hampton is the deceased's sister.

14.  Pictures of Wenona show her to be an African–American woman whose skin had a lighter shade of melanin.

Young at the Texas City Police Department. Harris, however, never showed up at the police station.

During the evening of Sunday, March 4, 2001, police were asked to go to Wenona's apartment regarding a missing person's report. Once there, police gained entry through the assistance of a family member and "processed" Wenona's apartment. They found no sign of a forced entry. They did find blood on some bed sheets, but the police later concluded this blood was consistent with menstrual blood.

On the evening of Saturday, March 3, 2001, Donney Caraway and Elicia Washington were waiting for a bus in north Houston to take them to a Louisiana casino. After 9:00 p.m., Harris arrived at the pickup point for the bus and joined Caraway, Washington, and the other riders for the trip to the casino. The bus left around 9:45 p.m. The group rode to the casino, gambled, and returned several hours later. Washington and Caraway described Harris as not being as lively as he had been on previous trips with them, but neither detected anything too unusual about his demeanor.

C. Analysis

■ Harris contends it is just as plausible that the person Misty and Betty saw Harris taking away from Wenona's apartment was Jyron. It is true that both Misty and Betty described the arm they saw extending from the sheet as belonging to a small woman or a child. However, there was also evidence that Harris had been stalking Wenona for quite some time, that he had assaulted and choked her in the past, that he had recent homicidal thoughts that were so severe they prompted Harris to commit himself to a psychiatric hospital, and that he had been seen at the apartment complex by several different people that day despite having initially denied being at Wenona's apartment. Even absent those factors, the jury could

have reasonably rejected Harris' alternative hypothesis that he took his son to the truck by wrapping the child inside a bed sheet and carrying the bundle (with child inside) over his right shoulder like a bag of laundry, especially when there was no testimony the child had difficulty walking on his own later that same evening when he went to eat with his half-brother's mother at a local restaurant. After reviewing all the evidence, we cannot say the jury's conclusion that Harris was the person who killed Wenona is against the great weight of the evidence or that his conviction is manifestly unfair or unjust. We overrule Harris' first point of error.

II. Hearsay

In his next point of error, Harris contends the trial court erred by permitting two witnesses to testify about statements the victim made before her death about Harris' potential for domestic violence. First, while watching a murder trial involving domestic violence, Wenona became very emotional and confided in her supervisor, Latonia Wilson, that Wenona believed Harris would kill her. Second, during an interview for a protective order against Harris, Wenona told Ella Anderson, an assistant criminal district attorney from Galveston County, about prior occasions when Harris had assaulted her in the couple's household. Harris argues the two statements admitted by the trial court did not fall within the excited utterance exception to the hearsay rule.

■ We may not reverse a trial court's decision to admit evidence under an exception to the hearsay rule, including the excited utterance exception, unless a clear abuse of discretion is shown. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex.Crim.App. 2003). An abuse of discretion occurs only when the trial court's decision "was so clearly wrong as to lie outside that zone

within which reasonable persons might disagree." *Id.* (quoting *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App.1992)).

■■■ " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex.R. Evid. 801(d). Hearsay is not admissible except as provided by statute or by the Texas Rules of Evidence. Tex.R. Evid. 802. "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. Tex.R. Evid. 803(2). This exception is called the "excited utterance" exception. For the excited utterance exception to apply, three requirements must be shown:

> (1) the statement must be the product of a startling occurrence that produces a state of nervous excitement in the declarant and renders the utterance spontaneous and unreflecting,
>
> (2) the state of excitement must still so dominate the declarant's mind that there is no time or opportunity to contrive or misrepresent, and
>
> (3) the statement must relate to the circumstances of the occurrence preceding it.

*Sellers v. State,* 588 S.W.2d 915, 918 (Tex. Crim.App. [Panel Op.] 1979); *Harvey v. State,* 123 S.W.3d 623, 630 (Tex.App.-Texarkana, pet. filed). It is the absence of opportunity for reflection and fabrication—an opportunity lost because the declarant is in the grips of overwhelming emotion—that forms the basis for the excited utterance exception. *Zuliani,* 97 S.W.3d at 595. "In other words, the statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event." *Id.*

With respect to the first statement, Wenona had been working as an in-court deputy district clerk, under Wilson's supervision, during a murder trial in which a husband killed his wife during a domestic dispute. After listening to the evidence in the case, Wenona began to cry. Wilson said Wenona became "absolutely" overwhelmed with emotion and very upset during the presentation of evidence. Wilson observed Wenona shaking in conjunction with her emotional state. In fact, Wenona had to leave the trial three or four times because "it got too hard for her." When Wenona left the first time, Wilson went with her, and Wenona confided in Wilson that she was upset because she believed Harris would kill her.

■■■ At trial, Harris objected to Wilson's testimony about Wenona saying she feared being killed by Harris. Harris objected on the basis that the statement's genesis was not from emotion or undue stress. On appeal, the State contends trial counsel's objection was insufficient to preserve the issue now raised on appeal by Harris. We disagree. Given both the context of Wilson's entire testimony and the prosecutor's explicit offering of the evidence pursuant to the excited utterance exception to the hearsay rule, we believe trial counsel's objection was sufficiently tailored to provide the trial court with notice of the issue being raised and was therefore sufficient to preserve it for our review on the basis now presented on appeal.

■■■ The startling event that triggers an excited utterance need not necessarily be the crime itself. *Hunt v. State,* 904 S.W.2d 813, 815–16 (Tex.App.-Fort Worth 1995, pet. ref'd). In *Hunt,* a child victim had been sexually assaulted by her father's friend. Three months later, while watching a television show about a young rape victim, she began to cry uncontrollably and told her mother what had happened. *Id.* at 815. The Second Court of

Appeals upheld the trial court's admission of the excited utterance on the basis that "the shock of seeing the television news program ... triggered K.S.'s fear of pregnancy and the ensuing out-of-court statements." *Id.* at 816. The *Hunt* court further noted that the evidence showed the utterance "was made before there was time to misrepresent and that it [the statement] related to the circumstances of the occurrence preceding it." *Id.* at 816–17.

In the case now before us, Wilson testified Wenona was completely overwhelmed by her emotions as a result of hearing the evidence during the murder trial. Wenona made the statement to Wilson when they left the courtroom after Wenona first became upset from observing the testimony in the murder case, and it is clear from Wilson's testimony that it was watching the events in the courtroom that triggered Wenona's emotional state. From the evidence in this case, we believe the trial court could have reasonably concluded Wenona was not able to reflect or fabricate such a reaction to the testimony and was under the excitement and stress of the events in the courtroom when she spoke, even though the events in question occurred several months before the time Wenona made the statements. *Cf. Apolinar v. State*, 106 S.W.3d 407, 417–19 (Tex. App.-Houston [1st Dist.] 2003, pet. granted) (passing of time between assault and excited utterance did not convert statement into hearsay when evidence showed utterance was made when victim had not had opportunity to reflect or fabricate). Accordingly, we cannot say the trial court acted outside the zone of reasonable disagreement in permitting Wilson to testify about Wenona's statement to her.[15]

With respect to the second statement, Anderson testified to the following during the State's case-in-chief:

[Anderson:] I was asking her [Wenona] who she was applying for a protective active order against and why.

[Prosecutor:] And what did she explain to you?

[Anderson:] She said she was applying for a protective order to protect her from her husband, William Harris. I believe she told me she had filed a divorce action against him and that was pending but not final at that time. *She said that he had committed an act of violence, act of physical violence against her.* She said [that] she was very afraid of him. She said that *in addition to the act of violence he had committed against her* that he had also threatened her, that he had admitted himself to a psychiatric facility because he was afraid of hurting her, these sort of things.

(Emphasis added.) Anderson then explained that Wenona appeared very upset and cried during the interview.

Nonetheless, the evidence showed Wenona had taken her own initiative in seeking the protective order from Anderson's office. This shows Wenona had given the matter some degree of reflection and thought. We cannot say Wenona's statement to Anderson is inherently trustworthy because it is not clearly the product of "an event speaking through the person rather than the person speaking about the event." *Zuliani*, 97 S.W.3d at 595. We hold the trial court abused its discretion by admitting the statement under the excited utterance exception.

Having found the trial court erred by admitting Anderson's testimony over Harris' proper hearsay objection, we must de-

---

**15.** Additionally, Wilson testified, without objection, that Harris himself had confessed to

her (before Wenona's death) he was afraid he would do something bad to hurt Wenona.

termine whether the error was harmful. TEX.R.APP. P. 44.2. The erroneous admission of evidence is nonconstitutional error, for which we review harm under Rule 44.2(b) of the Texas Rules of Appellate Procedure. We are not to reverse a criminal conviction unless, after examining the record as a whole, we have fair assurance that the error did influence the jury or had more than a slight effect. TEX.R.APP. P. 44.2(b); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998).

■ In this case, Anderson did not testify about the specifics of the assaultive offense that prompted Wenona to seek a protective order from her office. Another witness, however, did inform the jury about such specifics. Hampton testified that, over a period of three years, Harris assaulted Wenona on several occasions. In 1997, Harris threw a telephone at Wenona. In 1998 or 1999, Harris hit Wenona with a telephone, causing a black eye. Hampton also recalled a separate occasion when she saw Wenona with bruises on her neck where Harris had choked her. On appeal, Harris neither contends the trial court erred by admitting Hampton's testimony, nor did he specifically object to that evidence at trial. Thus, in light of Hampton's more detailed testimony, we cannot say the erroneous admission of Anderson's otherwise generic description of the prior assault influenced the jury's verdict or had more than a slight effect, if any at all. We overrule Harris' second point of error.

## III. Expert Testimony

In his third point of error, Harris contends the trial court erred by failing to hold a hearing on the admissibility of expert testimony on the "cycle of domestic

violence." [16] The State responds that the trial court was not required to permit voir dire under Rule 705(b) of the Texas Rules of Evidence because Anderson did not testify as an expert.

■ A person who is qualified as an expert by knowledge, skill, experience, training, or education may testify about scientific, technical, or other special knowledge that the trial court finds will assist the trier of fact in understanding the evidence, or in determining a fact in issue. TEX.R. EVID. 702.

> Prior to the expert giving the expert's opinion or disclosing the underlying facts or data, a party against whom the opinion is offered upon request in a criminal case *shall*, or in a civil case may, be permitted to conduct a voir dire examination directed to the underlying facts or data upon which the opinion is based. This examination shall be conducted out of the hearing of the jury.

TEX.R. EVID. 705(b) (emphasis added). The rule is clear: if a criminal defendant requests a hearing under Rule 705(b), the trial court *must* allow such an examination outside the jury's presence before the expert gives further testimony in the jury's presence. TEX.R. EVID. 705(b); *Alba v. State*, 905 S.W.2d 581, 587–88 (Tex.Crim. App.1995). By contrast, the rule regarding voir dire of experts in civil cases is permissive. The trial court errs if it denies a timely request to voir dire an expert witness in a criminal trial. *Alba*, 905 S.W.2d at 588. "In such a case, a reviewing court would then be required to decide whether the trial judge's error was so harmful as to require reversal." *Id.*

---

16. *See Scugoza v. State*, 949 S.W.2d 360, 363 (Tex.App.-San Antonio 1997, no pet.) (discussing testimony from director of battered women's shelter on emotional and behavioral patterns, and how those patterns tend to repeat themselves as part of a "cycle" of family violence).

In *Alba*, the prosecution called a psychiatric expert during the punishment phase of a capital murder trial. After the prosecutor qualified the witness as an expert and asked a hypothetical question that took up thirteen pages of the reporter's record, the defendant, for the first time, objected to the expert's testimony and requested a hearing outside the jury's presence pursuant to Rule 705(b). The trial court denied the request. In reviewing that denial on appeal, the Texas Court of Criminal Appeals noted, "The focus of Rule 705(b) is to prevent the jury from hearing the underlying facts and data which might ultimately be ruled as inadmissible." The court then held that the purpose of the Texas Rules of Evidence had been satisfied by the prosecutor's thirteen-page hypothetical and by the fact that no improper evidence had been errantly disclosed to the jury. The *Alba* court then held that the trial court did not err by denying the defendant's request for a Rule 705(b) hearing. *Id.*

At trial in the case now before us, Anderson explained her background as a Galveston County assistant criminal district attorney (she heads a department that prosecutes crimes of domestic violence and obtains protective orders on behalf of victims) and as a registered nurse who worked for many years in the emergency room. Harris' counsel then objected to Anderson's testimony. "Your Honor, she keeps going into domestic violence. She has expert testimony on that. I think I'd like to have a *Daubert* hearing to see whether she has scientific basis for that information." The trial court denied Harris' request. Harris later issued a second objection to the prosecutor's continued questioning of Anderson's anticipated testimony on the "cycle of violence." "Objection, Your Honor, the predicate still hadn't been laid, no scientific basis thereof." The trial court again overruled Harris' objection.

■ The trial court permitted Anderson to testify in general terms about a theory that has more commonly come to be referred to as "the cycle of domestic violence."[17] The State asked Anderson about the "cycle of violence" based on her "training and experience and backgrounds in the area of domestic violence." It is clear from the record that the prosecutor sought to demonstrate Anderson possessed specialized knowledge about domestic violence. Such specialized testimony is the very essence of expert testimony. *See, e.g., Burns v. Baylor Health Care Sys.*, 125 S.W.3d 589, 593–94 (Tex.App.-El Paso, 2003, no pet.) (analyzing whether proponent of expert testimony carried burden to provide proof of expert's qualifications). Accordingly, we do not agree with the State's suggestion on appeal that Anderson was testifying exclusively as a lay witness.

■ At this juncture, none of the data or facts underlying Anderson's testimony about the "cycle of violence" were before the jury. This distinguishes this case from *Alba*. In *Alba*, the defendant did not object until the "cat was already out of the bag." Here, the "underlying facts and data which might ultimately be ruled as inadmissible" were not yet before the jury. *See Alba*, 905 S.W.2d at 588. There is no indication in the record Harris knew or could reasonably be expected to know "the foundation of the expert's opinion." *See id.* Accordingly, we believe Harris' objection was

---

17. *See, e.g.*, Krieger, Sarah, Note, *The Dangers of Mediation in Domestic Violence Cases*, 8 CARDOZO WOMEN'S L.J. 235, 238 (2002) (discussing three phases of domestic violence cycle: (1) tension building, (2) acute explosion, and (3) the honeymoon).

timely and the trial court had a mandatory duty to allow a voir dire examination outside the jury's presence. *See* TEX.R. EVID. 705(b). The trial court abused its discretion by not allowing Harris to voir dire Anderson regarding the underlying data or facts that formed the basis of her testimony as an expert witness. We must now determine whether the error is "so harmful as to require a reversal." *Goss v. State*, 826 S.W.2d 162, 168 (Tex.Crim.App. 1992); *see also Alba*, 905 S.W.2d at 588 (suggesting in dicta that even had trial court erred, such error was "clearly harmless").

During the first six pages of her testimony, Anderson described her education, work experience, and her observations regarding common characteristics exhibited by victims of domestic violence. On a portion of the following page, she describes the "cycle of violence" concept. After that, Anderson spends the next twenty-one pages of testimony explaining how someone obtains a protective order through Anderson's office, and then tells the jury what Wenona herself had done to apply for a protective order against Harris.

■ It is clear from the record that Anderson's general observations of domestic abuse victims set a background for her later, more specific testimony, about Wenona going through the process of obtaining a protective order. That general testimony was relevant and probative because it aided the jury in understanding the process for obtaining such an order. *Cf. Scugoza*, 949 S.W.2d at 363 (witness' "cycle of violence" testimony probative and relevant because information assisted jury in understanding evidence). The purpose of the short interchange about the cycle of violence was not, in light of Anderson's entire testimony, to focus the jury's attention on some alleged pattern of continual violence

by Harris. And Anderson never applied the "cycle of violence" model to the facts of this case so as to suggest Harris' behavior was consistent with a perpetrator of violence. *Contrast Alba*, 905 S.W.2d at 588 (prosecutor asked expert to testify regarding opinions about case based on evidence); *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim.App.1992) (for novel scientific evidence to be admissible, proponent must show reliability by, among other things, showing technique was properly applied to occasion in question).

■ Anderson's testimony instead focused on patterns of response she had seen in victims' behavior as those patterns relate to incidents when victims ultimately abandoned pursuing the protective order. Anderson's testimony did not cross the line between assisting the jury and attempting to replace the jury as trier of fact. Viewing Anderson's testimony as a whole, we cannot say the trial court's failure to permit a Rule 705(b) hearing "was so harmful as to require reversal." *Cf. Jenkins v. State*, 912 S.W.2d 793, 814 (Tex.Crim.App. 1993) (trial court's noncompliance with Rule 705(b) harmless partially because expert provided no damaging, inadmissible testimony in jury's presence). We overrule Harris' third point of error.

## IV. Conclusion

For the reasons stated, we affirm the trial court's judgment.