

## In The
## Court of Appeals
## Sixth Appellate District of Texas at Texarkana

_____

No. 06-08-00191-CR
_____

MILTON LEE PATTERSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 336th Judicial District Court
Fannin County, Texas
Trial Court No. 22219

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

A jury found Milton Lee Patterson guilty of delivering between four to 200 grams of methamphetamine and, as a result, he received an enhanced life sentence due to two previous convictions. Patterson appeals the trial court's judgment on the grounds that hearsay objections were erroneously overruled and that the evidence against him was legally and factually insufficient.

## I. Factual and Procedural History

Controlled drug buys often fail to go as planned, particularly when it is necessary for the police to operate through inherently unreliable confidential informants. With that fact as a premise, it is no surprise that gaps in the evidence at trial resulted when Fannin County police officers used drug-addicted Ruth Ann Kimball to orchestrate a purchase of methamphetamine through Patterson. Obviously, her credibility was questioned by Patterson.

Kimball was dating James Thornton, reported to be one of the most notorious narcotics traffickers in Fannin County. Both Kimball and Thornton were apprehended by the police after a traffic stop resulted in drug-related charges being brought against them. According to Kimball, Officer "David Thompson wanted another conviction." On several occasions, "[he] promised [her] that [she] would never go to court," "[t]hat that charge would be dropped," and that Thornton "would only get like two years," if she agreed to serve as a confidential informant.[1]  Responding to

_____

[1]Kimball states Thompson was aware of the charges pending against her. Thompson contradicted the claims, denying knowledge of any pending charges or of having made any promises to Kimball, even though he was aware "that she was stopped in a car, and her husband or boyfriend had went to jail for drugs." He admits that he did not have much time to determine if Kimball was

2

Thompson's urging, Kimball agreed to participate. She received a tip from a friend who had previously acquired methamphetamine from Patterson. Although she had no dealings with him before, Patterson became her target.

Kimball indicated that she was "high all the time" on a combination of methamphetamine, alcohol, Xanax, and possibly Hydrocodone, and that she did not recall many events clearly. While the day of Patterson's takedown seemed "like a dream" or a "haze," the following events remain uncontested:

Kimball met with Thompson prior to the proposed drug buy.[2] She called Patterson using her cell phone and arranged for him to purchase a quarter ounce of methamphetamine for her. In a recorded conversation, Patterson quoted Kimball a price of $325 for the drugs and requested that Kimball meet him at the Bonham Wal-Mart parking lot.[3] Thompson gave Kimball marked bills totaling $325. Accompanied by several surveillance officers, Kimball drove to Wal-Mart, parked her car, and waited for Patterson. A 1999 purple Dodge truck, known to be one often driven by

---

credible. Officer Terry Bee, who was working with Thompson, testified that he was aware that Kimball was on community supervision and was participating in the drug court program.

[2]Kimball denied going to the sheriff's office or being searched. This fact was contested by Thompson and Officer Wayne Walker, who reported that they searched Kimball and her vehicle for contraband and money. The officers admit they were unable to do a full pat-down search because a female officer was not present.

[3]Thompson testified that he recognized Patterson's voice during this initial conversation. Although a price and meeting place were arranged, no mention of drugs was made on this tape recording.

Patterson, entered the Wal-Mart parking lot and stopped beside Kimball's car. Kimball exited her vehicle, gave Patterson the money, and got back inside her car, exchanging no conversation with Patterson. Surveillance officer Bee positively identified Patterson while Thompson photographed the vehicles. Neither officer actually saw Kimball pay over the money to Patterson. Thompson and Bee then followed Patterson as he left the parking lot.

Kimball, who was instructed to go to a safe place where she commonly went, drove to the American Legion hall, which maintained a bar. She informed the officers that Patterson would meet her around seven o'clock. Although Walker was supposed to keep her under constant surveillance, he remained parked outside the American Legion hall and could not observe Kimball as she proceeded to play pool and drink beer inside.[4]

Meanwhile, the officers following Patterson identified him as he made a quick stop at the Lucky Food Mart. He then made another brief stop at an apartment, traveled to a suspected drug house, and went back to the apartment, where he remained for approximately forty-five minutes. Patterson then went to an abandoned gas station and drove past it several times. Thompson testified that this tactic, which he called a "heat run," is commonly employed by drug traffickers to determine whether they are being followed. Eventually, Thompson observed Patterson's purple truck enter the American Legion hall parking lot. Kimball's vehicle fell in line behind Patterson, and Thompson trailed behind Kimball.

---

[4]Walker even admits he "lost her because of where I was setting up at . . . [for] [a]bout a minute-and-a-half."

When the vehicles were half a mile west of the Bonham city limits, Kimball pulled over on the highway behind Patterson. Thompson drove past the vehicles, and circled back around without headlights in order to better observe the vehicles. The dark, rainy night obstructed his vision and he was unable to see what happened inside Kimball's vehicle. Thompson testified that he observed Patterson exit his truck and enter Kimball's car. Kimball indicated that she remembered very little of this meeting, recalling only that she had asked Patterson how he was doing and then watched as Patterson returned to his truck.

Her poor recollection resulted in two versions of the following events. Kimball next remembers being with Thompson at the Ector convenience store in his truck. She says there were drugs in Thompson's vehicle, but was not sure where they came from. Kimball testified, "I guess, I gave them to him. . . . . I must have, you know, I can't be sure. I was high myself," on methamphetamine, Xanax, and alcohol.

Thompson testified he ordered officers in Bonham to stop Patterson on his way back into town and instructed Kimball to meet him at the Ector convenience store. Thompson said Kimball had a clear bag containing a white crystal substance that appeared to be methamphetamine. He retrieved her recording device and mailed the substance to the Texas Department of Public Safety (DPS) laboratory for testing. Because the recording device can only record a designated number of hours, its capacity was exceeded before Kimball's meeting with Patterson at the American Legion

hall, as well as the critical subsequent events following that meeting and there was no recording of their conversations available.

Patterson was detained and arrested in Bonham. A search of his car produced only a cell phone (which indicated that it had been used to correspond that day with Kimball). The officers never located the marked money, which had been given previously to Kimball; no search was conducted of the purported drug house where Patterson had stopped earlier in the day. The DPS crime laboratory in Garland conducted tests on the package which Thompson mailed to it; the tests revealed that it contained 6.76 grams of methamphetamine. The jury found Patterson guilty of delivering this methamphetamine.

## II.     Thompson's Testimony Was Not Hearsay

We review rulings admitting statements alleged to be hearsay for an abuse of discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). A trial court abuses its discretion when it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *Howell v. State*, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005); *Reynolds v. State*, 277 S.W.3d 355, 371 (Tex. App.—Texarkana 2007, no pet.).

Patterson first complains of alleged hearsay statements made by Thompson after he was recalled by the State. The following exchange occurred after the evidence recited above was developed:

> Q.      When you got to Ector and y'all both got to a convenience store there, where was the methamphetamine?

6

A. We pulled up next to each other at the gas pumps. And she jumped in out of her car into my undercover vehicle. And she had it in her hand.

Q. Okay. So she gave it to you?

A. Yeah. She laid it on the console.

Q. Did she identify anybody who had been in her car during that stop?

A. Yes, she said Milton.

[Counsel for Patterson]: I'll object to hearsay.

[Counsel for State]: Your Honor, it's a statement for identification, not hearsay.

THE COURT: Overruled.

A. She advised Milton Patterson.

Q. (By Mr. Setterberg) At that time in Ector?

A. In Ector had delivered that. Had not --

[Counsel for Patterson]: I'm going to object to hearsay, offered for the truth of the matter asserted.

THE COURT: Overruled.

A. Not only did she mention that, she also advised that he stated it weighed right.

[Counsel for State]: Pass the witness, Your Honor.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). It is

7

inadmissible except as provided by statute. TEX. R. EVID. 802. A statement is not hearsay if the declarant testifies at trial, is subject to cross-examination, and the statement is "one of identification of a person made after perceiving the person." TEX. R. EVID. 801(e)(1)(C). Here, Kimball was present at trial, was actually recalled after Thompson was recalled (and was thus subject to cross-examination), the statement involved an identification of Patterson, and Kimball's testimony shows she had ample opportunity to perceive Patterson. Thus, this statement was one of identification and was not hearsay. *Chaney v. State*, No. 01-08-00204-CR, 2009 WL 1086952, at *10 (Tex. App.—Houston [1st Dist.] Apr. 23, 2009, no pet.) (mem. op., not designated for publication); *Rodriguez v. State*, 974 S.W.2d 364, 371 (Tex. App.—Amarillo 1998, pet. ref'd) (testimony by officer that victim had identified appellant as assailant not hearsay per Rule 801(e)(1)(C) of Texas Rules of Evidence); *Miller v. State*, 843 S.W.2d 265, 267 (Tex. App.—Fort Worth 1992, no pet.). Moreover, Thompson merely reiterated Kimball's identification recited in her previous testimony. *See Rodriguez*, 974 S.W.2d at 371.

Patterson also argues that while the State's question, "At that time in Ector?" did not call for hearsay itself, the response, "In Ector had delivered that. Had not --" was inadmissible hearsay. It is not clear that Thompson was testifying about an out-of-court statement made by Kimball at this point. Consequently, we cannot find the trial court abused its discretion in overruling the objection. Last, Patterson refers to Thompson's "unsolicited and entirely gratuitous statement," "[n]ot only did [Kimball] mention that, she also advised that he stated it weighed right." We agree that this

8

statement was hearsay. However, Patterson failed to object to this part of the testimony; failing to object, he failed to preserve the issue for review. TEX. R. APP. P. 33.1; *Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002).

We overrule this point of error.

## III. Legally and Factually Sufficient Evidence Supported the Verdict

Patterson next contends that the evidence was both legally and factually insufficient to support his conviction. Legal and factual sufficiency questions involve distinctly separate analyses. The requirement of legal sufficiency serves as a tool to determine whether submission of an issue is required. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). In other words, if the evidence in this case was insufficient to raise an issue of Patterson's guilt, it should not have been submitted for the jury's decision, and we must render a judgment of acquittal. *Id.* When conducting this analysis, we review all of the evidence in the light most favorable to the verdict and determine whether any rational jury could find the essential elements of the crime beyond a reasonable doubt. *Lacour v. State*, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Clewis*, 922 S.W.2d at 132–33. We also measure the evidence "against the elements of the offense with the same kind of analysis as that applied in the test for a hypothetically correct jury charge for the case." *Ferralez v. State*, No. 06-08-00064-CR, 2009 WL 454335, at *1 (Tex. App.—Texarkana Feb. 25, 2009, no pet.) (mem. op., not designated for publication) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see also Grotti v. State*, 273 S.W.3d

273, 280 (Tex. Crim. App. 2008). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

Once this threshold *Jackson* standard is met, however, we will not sit as the thirteenth juror re-evaluating the weight and credibility of the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we give full play to the jury's responsibility to weigh the evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic facts. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Clewis*, 922 S.W.2d at 133; *Bottenfield v. State*, 77 S.W.3d 349, 354 (Tex. App.—Fort Worth 2002, pet. ref'd) (citing *Jackson*, 443 U.S. at 319).

On the other hand, because factual sufficiency is an issue of fact, we are not free to re-weigh the evidence and set aside the jury verdict merely because we feel a different result is more reasonable. *Clewis*, 922 S.W.2d at 135. Instead, we give due deference to its determinations and will find the evidence to be factually insufficient only when necessary to prevent manifest injustice. *Johnson*, 23 S.W.3d at 8–9, 12; *Clewis*, 922 S.W.2d at 133, 135. Thus, unlike our legal sufficiency review, we examine the evidence in a neutral light when assessing factual sufficiency and determine whether the proof of guilt is so obviously weak as to undermine confidence in the verdict, or, if taken alone, is greatly outweighed by contrary proof so as to be clearly wrong and unjust. *Johnson*, 23

S.W.3d at 11; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); *Harris v. State*, 133 S.W.3d 760, 764 (Tex. App.—Texarkana 2004, pet. ref'd). We also use the hypothetically correct jury charge to evaluate factual sufficiency. *Grotti*, 273 S.W.3d at 281.

Delivery of a controlled substance is an offense under the Texas Controlled Substances Act. TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) (Vernon 2003). Deliver "means to transfer, actually or constructively, to another a controlled substance . . . . The term includes offering to sell a controlled substance." TEX. HEALTH & SAFETY CODE ANN. § 481.002(8) (Vernon 2003). The applicable hypothetically correct jury charge would, therefore, require the State to bring forth proof of the following elements: that (1) Patterson, (2) had direct or indirect control of, (3) a controlled substance, (4) which he knowingly or intentionally, (5) delivered. *See Hayes v. State*, 265 S.W.3d 673, 680 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). Actual delivery consists of transferring or surrendering "the real possession and control of a controlled substance from one person to another person." *Heberling v. State*, 834 S.W.2d 350, 354 (Tex. Crim. App. 1992); *Ex parte Perales*, 215 S.W.3d 418, 420 (Tex. Crim. App. 2007).

A constructive transfer can occur by placing the contraband "in a particular location and then advis[ing] the recipient of this location so that the recipient can retrieve" it. *Sims v. State*, 117 S.W.3d 267, 268–69 (Tex. Crim. App. 2003). Deliver by offer to sell "is complete, when, by words or deed, a person knowingly *offers* to sell what he states is a controlled substance." *Stewart v. State*, 718 S.W.2d 286, 288 (Tex. Crim. App. 1986).

11

"[P]roof of an offer to sell must be corroborated by: (1) a person other than the person to whom the offer is made; or (2) evidence other than a statement of the person to whom the offer is made." TEX. HEALTH & SAFETY CODE ANN. § 481.182 (Vernon Supp. 2008). Corroboration can include an electronic recording of the transaction, testimony of witnesses other than Kimball, and evidence that Patterson had possession of or access to the controlled substance offered. *See Knight v. State*, 91 S.W.3d 418, 422 (Tex. App.—Waco 2002, no pet.). Since the jury must "almost always" infer the mental culpability of the defendant from their acts, conduct, and words, evidence which corroborates Patterson's testimony will be probative of his intent or knowledge. *Id.* at 423.

In reviewing the evidence above, we conclude, not only that the evidence was sufficient to raise an issue about Patterson's guilt, but also that a rational jury could find delivery beyond a reasonable doubt based on the hypothetically correct jury charge. *Lacour*, 8 S.W.3d at 671. While Kimball's memory of the event is faded, cloudy, and sketchy, the jury could have easily chosen to believe Thompson's version of the events—that the search of Kimball before the operation commenced showed that she had no contraband, but she produced methamphetamine to Thompson after meeting with Patterson on the side of the highway—suggesting an actual or constructive transfer from Patterson to her. Kimball's testimony that Patterson offered to sell a quarter ounce of methamphetamine to her is corroborated by Thompson's testimony, tape recording Exhibit 1 ( where Patterson is heard quoting a price of $325 and requesting Kimball meet him at the Wal-Mart parking lot), and tape recording Exhibit 8 (which contained the following excerpts):

12

[Thompson:] Okay. Today's day is March 13, 2007. It's approximately 5:30 p.m. We've called--what's Milton's phone number? He's going to meet us at Wal-Mart . . . That's Milton Patterson. He drives what? Purple Dodge Truck?

[Kimball:] Purple truck.

[Thompson:] Purple truck. Okay. He's going to meet us at Wal-Mart, you're going to give him the $325, he's going to go get a quarter ounce of meth, he's going to deliver it back to us at the VFW.[5]

. . . .

[Kimball on telephone to Patterson:] "Hey, I was just calling to see what's up. Is everything okay? . . . . Um, anyway I'm going to be in my car sitting out front of the American Legion. So let me know something alright. If you can't just bring me my money."

Certainly, this evidence was legally sufficient to submit the issue of Patterson's guilt to the jury under all three definitions of delivery.

Further, we give due deference to the jury's determination based on reasonable inferences from this evidence that Patterson knowingly offered to sell methamphetamine to Kimball through his words, and by his deeds in taking Kimball's money, traveling to a known drug house, returning to the American Legion hall, and meeting with Kimball on the side of the highway. *See Stewart*, 718 S.W.2d at 288 ("[W]hen delivery is by offer to sell no transfer need take place. A defendant need not even have any controlled substance."). Because we cannot say that the verdict is clearly wrong and unjust, or that proof of Patterson's guilt is obviously weak or is greatly outweighed by contrary proof, we find the evidence was both legally and factually sufficient.

---

[5]The record demonstrates that the American Legion was referred to as the V.F.W.

13

## IV. Conclusion

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:     May 4, 2009
Date Decided:       May 12, 2009

Do Not Publish