**Edward ATES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 12–98–00282–CR.**

Court of Appeals of Texas, Tyler.

Jan. 31, 2000.

Rehearing Overruled March 2, 2000.

Linda A. Altier, Tyler, for Appellant.

Edward J. Marty, Jack Skeen, Jr., Tyler, for Appellee.

Panel consisted of RAMEY, Jr., C.J., HADDEN, J., and WORTHEN, J.

JIM WORTHEN, Justice.

Edward Ates appeals his conviction for murder. After finding him guilty, the jury sentenced Appellant to ninety-nine years' confinement in the Texas Department of Criminal Justice—Institutional Division. In seven points of error, Appellant attacks the sufficiency of the evidence to support the conviction and asserts that the trial court erred in excluding certain evidence. We affirm.

On the evening of Friday, July 23, 1993, Elnora Griffin was found dead on the living room floor of her home, having suffered a knife wound to the neck. Griffin was four feet, four and one-half inches tall and weighed 104 pounds. There was no forced entry into the home, but there was evidence of a struggle in the master bedroom and the living room. The victim's clothes were found in the bedroom. Matter identified as the victim's fecal material was in several places in the bedroom. In one area on the floor, the fecal material had been smeared as if stepped in. A transferred fecal material stain was on the kitchen linoleum. The medical examiner testified that Griffin was "under pressure of the neck" or grabbed by the neck and it is common for someone to defecate as a result of such pressure. Appellant is six feet, six inches tall and weighs over two hundred pounds.

Johnnie Pryor, Griffin's cousin, owns the mobile home Griffin lived in. The mobile home sits on Pryor's property, near her house. Maggie Dews, Appellant's grandmother, lives in a house on the other side of Pryor. At the time, Appellant and his brother, Kelvin, were living with Ms. Dews. Appellant did yard work and other odd jobs for Pryor and Griffin. On Thursday, July 22, 1993, Appellant went to Pryor's house at about 8:30 or 8:45 p.m. to discuss Pryor's request that he paint her house. Pryor then went to work. She returned from work the following morning between 7:15 and 7:30. While she was still in the garage, Appellant came over to talk to her about his charge for painting. Pryor did not see Griffin's car when she returned and thought Griffin had gone to work. At some time during the day, Cubia Jackson, a friend, called and told her Griffin did not go to work that day. Later that evening, Pryor went out her back door and saw Griffin's car parked behind the mobile home, in a place Griffin never parked. When calling Griffin brought no response, Pryor went over to the mobile home and knocked on the front door. She then returned to her house and called Ms. Dews. Pryor found her key to the mobile home and the two women went to Griffin's. Pryor opened the door and looked in. She saw Griffin, nude, lying face down on the living room floor. Prior and Dews returned to Pryor's house to call 911. When they went back outside, Appellant and his brother were outside by the mobile home. Pryor could not remember whether she

locked the mobile home door before or after she called 911.

Charles Aldrich, an EMT and volunteer firefighter, was the first emergency personnel on the scene. He saw only Pryor and Dews when he arrived and the mobile home's front door was locked. He did not disturb the crime scene. He merely ascertained that there was nothing he could do for the victim. He believes he later saw two males walk up on to the porch, but a deputy stopped them before they went in to the mobile home.

Deputy Roy Tomlin of the Smith County Sheriff's Department was the first law enforcement officer on the scene. He arrived some time between 7:30 and 8:00 p.m. He saw Appellant and Kelvin walk up on the porch and open the screen door. He told them not to go in the house. He testified that they did not go in the house while he was there. Tomlin secured the crime scene.

That same night, Appellant gave a brief written statement to a deputy in which he said that he and his brother went over to the mobile home when they saw flashing lights. Someone told them not to go into the house. However, they went in the front door anyway and then a "sheriff came."

A towel was nailed over the window in the mobile home's front door where a curtain had been torn down. Deputies had, on Friday night, seen the imprint of a large hand on that towel. Lieutenant Jason Waller examined Griffin's car and found that the driver's seat was pulled back. Waller found a Jolly Rancher candy wrapper in the trash can in the guest bathroom and also found a Jolly Rancher candy wrapper in his office after Appellant was interviewed there. Griffin's purse and keys were never found.

A friend of the victim, Cubia Jackson, testified that she had called Griffin between 9:45 and 10:30 p.m. on July 22, the night before the body was found. Griffin told Jackson that she was "sitting here talking to Edward." Jackson asked, "Edward who?" Griffin responded, "Edward Louis, Ms. Dews' grandson." They ended the conversation and Griffin was to call Jackson back later. She did not call back. Griffin did not go to work on Friday, July 23.

At about midnight on Friday night, Appellant gave a statement to Detective Dale Hukill of the Smith County Sheriff's Department. The statement was recorded, transcribed, and admitted into evidence. In this statement, Appellant stated that, on Friday night, he and Kelvin stepped in the front door, saw the body, and came out of the house. Appellant denied being in Griffin's house at 10:00 o'clock on the night of the murder. He explained that, on Thursday night, he left his house about 9:30 when his ex-girlfriend, Monica Bush, picked him up. They went to her apartment and talked until about midnight. She dropped him off at his grandmother's house about 12:45 or 1:00. He said he went to bed about 1:15. He claimed to have told his brother that Monica was coming to pick him up. During this interview, Hukill scraped a substance off Appellant's shoe that smelled like feces.

A few days later, Hukill interviewed Appellant again. This interview was also taped, transcribed and entered into evidence. Appellant again stated that Monica picked him up and that he had told Kelvin she was going to. He said that Monica left his grandmother's house at 1:00 or 1:15 after dropping him off. He called her at her apartment and they talked on the phone until about 2:00 a.m.

Hukill testified that the fecal material he scraped off of Appellant's shoe was of human origin, but could not be tied to a particular human or blood group. Appellant told Hukill that he was wearing the same clothes during the Friday night interview that he had been wearing on Thursday night. He took pictures of Appellant on Friday night to show his clothing. Hukill testified that it is 10.3 miles from Bush's apartment to Griffin's mobile

home and it takes about thirteen minutes to get there.

Monica Bush testified that, on July 22, Appellant came to her apartment door around 11:30 or 11:45 p.m. She was not expecting him. He was sweating and looked unkempt. She and Appellant talked until about midnight. Appellant had told her that he came to the apartment complex with a friend of his named Marcus, who was around the corner visiting his girlfriend who lived in the complex. That same night, Appellant called her at 1:00 or 1:30 and they talked for at least thirty minutes. She viewed the pictures of Appellant that Hukill had taken on Friday night and said that he had on different clothes on Thursday night. She testified that she spoke to Appellant in August and asked him why he did not have Marcus verify where he was that night. Appellant admitted to her that Marcus did not exist. He then said he drove his grandmother's car to her apartment that night. She said that it takes about twenty-five or thirty minutes to drive from Appellant's grandmother's house to her apartment.

Marsha Bush, Monica's mother, testified that she and Monica live together. She stated that Monica did not pick Appellant up at his house on that Thursday night. He came over to their apartment before midnight, maybe 11:30.

Kelvin Ates, Appellant's brother, testified that, on that Friday evening, he and Appellant walked over to the mobile home after they saw emergency vehicles there. The front door to the mobile home was open and he opened the screen door and saw the body. He said that neither he nor Appellant went into the house that night. When the officers said not to go in the house, they complied and stepped off the porch. He testified that Appellant left their grandmother's house the night before and that Appellant did not have a car. He also said that he did not see Monica Bush pick Appellant up. He does not know where Appellant was that night.

Jesse Nelson testified that he was living in the same apartment building as Monica Bush in July 1993. He identified a picture of Griffin's car as the car he had seen at the apartment complex on the night of Thursday, July 22. He could not remember the exact time, but said it was "between 10:30 and 11:30 approximately. No later than about 12 something."

Cedric Wheeler, Nelson's step-son, also saw Griffin's car in the parking lot of the apartment complex late on that Thursday night.

Leonard Mosley testified that he had been dating Griffin at the time of her death. In July 1993, his regular shift was from 11:30 a.m. until 11:00 p.m. He routinely went over to Griffin's house after work on Thursday nights. He had been planning on going to her house on the 22nd and she was expecting him. However, when he got to work, he found out he had to work on Friday so he decided to go home instead of going to Griffin's that night. He tried to call her, but got no answer. After work on Thursday, he went straight home. Mosley stated that he told Timothy Lownds, Appellant's investigator, "a lot of things just leading him on" in an attempt to get information from him.

Kenneth Snow, a resident of the Smith County jail, testified that Appellant, who was at the time also an inmate, asked Snow to lie on Appellant's behalf in exchange for $1,000.00. Appellant gave him a handwritten script and asked Snow to memorize it. Snow was to testify that he had witnessed a conversation between Appellant and someone named Frances Johnson in which Johnson admitted to murdering Elnora Griffin. Snow agreed to do as Appellant asked, but mailed the script to the District Attorney. The script was admitted into evidence as State's Exhibit 130. Snow also testified that another inmate, nicknamed "Louisiana," had been recruited to testify falsely for Appellant.

Denise Jarrett, a handwriting expert, testified that in her opinion State's Exhibit 130 was written by Appellant.

Clinton Johnson testified that he had been in jail with Snow and Appellant. Some people called him "Louisiana." He stated that no one asked him to lie about anything.

Jeffery Wright, also a Smith County jail resident, testified that he never asked Snow to write a letter to an Assistant District Attorney for him. Defense Exhibit 22 is a letter to an Assistant District Attorney, in Snow's handwriting, but signed "Jeff Wright." Wright denied signing the letter. The State introduced jail documents with Wright's signature on them and Wright's probation file which also contained his signature.

Margie Jackson, Appellant's mother, stated that in the summer of 1993 she used crack cocaine. She testified that on Thursday, July 22, 1993, at and after sundown, she and Appellant were strolling the neighborhood looking for drugs for her to buy. She also said that Appellant had her truck that evening.

■ Timothy Lownds testified that he worked as an investigator for the defense. He interviewed Leonard Mosley on three occasions. Mosley told him that the victim had called him at 11:00 p.m. and that the victim's future daughter-in-law had called the victim around 11:00 on July 22. On cross, he clarified that Mosley said the daughter-in-law had called from Dallas and had gotten no answer. He contends that the State's case is based on nothing more than innuendo, supposition, and suspicion. The only evidence tending to connect him to the crime, he argues, is the human feces on his shoe and the fact that he lied about his whereabouts on Thursday, July 22. Accordingly, Appellant argues that the State did not prove that Griffin's death was caused by his criminal act. Conceding that the Court of Criminal Appeals has abandoned the reasonable hypothesis analysis for reviewing the sufficiency of circumstantial evidence, Appellant nonetheless asserts that the reasonable hypothesis standard would be a valuable tool for reviewing the evidence in this case.

■ The standard for reviewing the legal sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the offense charged. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The trier of fact is the sole judge of the weight and credibility of the witnesses and may believe or disbelieve any part of any witness's testimony. *Williams v. State*, 692 S.W.2d 671, 676 (Tex.Cr.App.1984). The jury is entitled to draw reasonable inferences from the evidence. *Benavides v. State*, 763 S.W.2d 587, 588–89 (Tex.App.—Corpus Christi 1988, pet. ref'd). The jury may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence. *Griffith v. State*, 976 S.W.2d 686, 690 (Tex.App.—Tyler 1997, pet. ref'd). The evidence is measured for sufficiency by looking at the indictment as incorporated in the court's charge to the jury. *Fisher v. State*, 887 S.W.2d 49, 53 (Tex.Crim.App.1994) (op. on reh'g). The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. *Alexander v. State*, 740 S.W.2d 749, 758 (Tex.Cr.App.1987). The reasonable alternative hypothesis analysis for reviewing the legal sufficiency of circumstantial evidence has been abandoned. *Sonnier v. State*, 913 S.W.2d 511, 516 (Tex.Cr.App.1995).

Only one house, Pryor's, separated Griffin's house, the site of the murder, and Appellant's grandmother's house, where Appellant was living at the time. Appellant was at Pryor's house at 8:30 or 8:45 p.m. on Thursday night and again at 7:15 or 7:30 a.m. Friday morning. One witness actually placed him in Griffin's house sometime between 9:45 and 10:30 p.m. Thursday night. The fact that Griffin

knew Appellant is consistent with the fact that there was no evidence of forced entry. Griffin, a petite woman of four feet, four and one-half inches, weighing only 104 pounds, could easily be overcome by a man Appellant's size, six feet, six inches, weighing over 200 pounds. From the large hand print on the towel over the window on the door, the jury could infer that the assailant was a large man. Thus, Appellant had easy access to the victim, was the last known person to see her alive, and was physically capable of carrying out the attack.

In the course of the attack, Griffin had involuntarily defecated. One fecal material stain in the bedroom had been stepped in and transferred to the kitchen. Pryor and Dews did not go in the mobile home. Testimony of the officers investigating the scene was that, after the body was discovered, no one stepped in any fecal material. Kelvin stated that neither he nor his brother went into the house after the body was found. In his statement, Appellant said he and Kelvin stepped in the door, saw the body and went back out. He did not indicate that he walked around inside the house, walking first to the bedroom and then to the kitchen. Yet, Appellant had human fecal material on his shoe. No one else was shown to have that substance on their shoe and, except for the implication that he stepped in the material after the body was found, Appellant provided no explanation for its presence on his shoe.

Griffin's purse was never found. From this the jury could infer that one motive for the murder was robbery. Griffin was found nude and evidence clearly showed a struggle in the bedroom and the living room. From this evidence the jury could also infer that another possible motive for the murder was anger resulting from the victim's possible resistance to her attacker's sexual advances.

Appellant lied about his activities of Thursday night. He said Bush picked him up at his grandmother's house about 9:30 p.m. and brought him back to his grandmother's house about 12:45 or 1:00 a.m., indicating that they were together for approximately three to three and one-half hours. Bush testified that she did not pick Appellant up or drop him off and that he was at her apartment only for about fifteen minutes, from 11:45 until midnight. At the time, he told her he had ridden over with a friend named Marcus. A few weeks later, Appellant admitted to her that Marcus did not exist and that he had lied to her about how he arrived at her apartment. However, he told her he drove his grandmother's car to her apartment. Further, Appellant told Hukill that he was wearing the same clothes on Friday night that he wore on Thursday night. Bush viewed the photos of Appellant which were taken on Friday night and testified that he had been wearing different clothes on Thursday night. Also, on Thursday night, he was sweating and appeared unkempt.

Griffin's car had been moved from its usual parking space. The car keys were never found. Two witnesses placed that vehicle at Bush's apartment building just before or around midnight on Thursday. By his own admission, Appellant was there at that time. Further, although Griffin would not need to have the seat pushed all the way back and, indeed, would not have been able to reach the pedals, the seat was all the way back. Appellant, an extraordinarily tall man, would need the seat pushed back. Thus, the jury could have found a connection between Appellant and Griffin's car.

Snow testified that Appellant tried to get him to lie and say that Snow had overheard Johnson confess to Griffin's murder. While Appellant attempted to discredit Snow, the jury was entitled to believe Snow. If Snow is to be believed, Appellant went to some effort to attempt to manufacture evidence that would shift responsibility for the murder to another individual.

Viewing the evidence in the light most favorable to the verdict, we conclude that a

rational trier of fact could have found the essential elements of murder beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781. The jury could have believed from the nature of Appellant's actions on Thursday night that he was attempting to provide himself with an alibi. The only testimony was that he was the last one to see Griffin alive. He had the opportunity and motive to kill her. He had human fecal material on his shoe less than twenty-four hours after he saw Griffin in her home. Considering only the evidence in favor of the verdict, we find that a rational jury could find Appellant guilty of murder beyond a reasonable doubt. *See Reeves v. State*, 969 S.W.2d 471, 479 (Tex.App.—Waco 1998, pet. ref'd). We overrule Appellant's first issue.

■ When reviewing the factual sufficiency of the evidence, we view all the evidence, but not in the light most favorable to the prosecution. *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Cr.App.1997). We set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Cr.App.1996). In conducting this analysis, our duty is to examine the trier of fact's weighing of the evidence. *Scott v. State*, 934 S.W.2d 396, 398 (Tex.App.—Dallas 1996, no pet.). We consider all of the evidence in the record related to an appellant's sufficiency challenge, comparing the weight of the evidence that tends to prove guilt with the evidence that tends to disprove it. *See Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Cr.App.1997). Because we consider all of the evidence in conducting a factual sufficiency review, we necessarily consider any reasonable alternative hypotheses raised by the evidence. *Richardson v. State*, 973 S.W.2d 384, 387 (Tex.App.—Dallas 1998, no pet.). However, the mere existence of a reasonable alternative hypothesis does not render the evidence factually insufficient. *Id.*

Because the jury is the sole judge of the facts, we must give deference to jury findings. *Cain*, 958 S.W.2d at 407. What weight to give contradictory testimonial evidence is within the sole province of the jury, because it turns on an evaluation of credibility and demeanor. *Id.* at 408–09. We are not free to reweigh the evidence and set aside a jury verdict merely because we feel that a different result is more reasonable. *Id.* at 407. We cannot reverse the verdict if reasonable minds could differ about the conclusions to be drawn from the evidence. *Richardson*, 973 S.W.2d at 387. We find the evidence factually insufficient only where necessary to prevent manifest injustice. *Cain*, 958 S.W.2d at 407. A decision is not manifestly unjust merely because the jury resolved conflicting views of the evidence in favor of the State. *Id.* at 410. Additionally, a decision is not manifestly unjust merely because the defense has presented a reasonable alternative hypothesis. *See Richardson*, 973 S.W.2d at 387.

We have set out above all the evidence tending to prove guilt. The evidence tending to disprove guilt is as follows. With the exception of the fecal material on Appellant's shoe. there is no physical evidence linking Appellant to the crime scene. Appellant denied being in Griffin's home on Thursday night and claimed to have been with Bush from 9:30 until 1:00 on Thursday night. Also, Appellants's mother offered at least a partial alibi for him. She said he was with her at and after sundown on Thursday night and that he had her truck that night. Additionally, Appellant presented evidence regarding other potential suspects, Mosley, Williams, and Frances Johnson.

We consider first the significance of the fecal material on Appellant's shoe. The victim's fecal matter was on the floor of the bedroom and a smear of transferred fecal matter was on the kitchen floor. The State's theory is that Appellant stepped in the fecal matter in the bedroom during the struggle and transferred it to the kitchen floor at some point before leaving the house after the murder, but retaining

some of the material in the crevices of his tennis shoe. The State did not, however, prove that the fecal matter on Appellant's shoe was the victim's.

In his statement, Appellant asserted that he and his brother entered the mobile home after the body was found. To the extent that he is arguing that he stepped in the fecal material at that time we again consider the discrepancies in the testimony. First, he said he stepped in the door and went back out. He did not say he walked through the house. Second, all other testimony, including Appellant's brother's, was to the effect that no unauthorized personnel went into the house after the body was found and that no one who went in stepped in the fecal material. Accordingly, there is conflicting evidence about whether Appellant had the opportunity to step in the fecal matter at a time other than during the struggle with Griffin or perhaps immediately after the murder, but before the body was found by Pryor and Dews. In short, there is only controverted evidence that he had the opportunity to get fecal material on his shoe after the body was found. The weight to give contradictory evidence is within the sole province of the jury and we must give deference to its findings. *See Cain,* 958 S.W.2d at 407–409. Further, the record provides no other explanation as to the origin of the fecal matter on Appellant's shoe.

The jury weighed Cubia Jackson's testimony that Griffin told her Appellant was "sitting here" talking to her on Thursday night with Appellant's denial that he had been there. There is only controverted evidence that he was elsewhere. The jury weighed Appellant's statement that he had been with Monica Bush from 9:30 until 1:00 on Thursday night with Bush's testimony that they were together only for about fifteen minutes, from 11:45 until midnight. Monica Bush's testimony is supported by her mother's testimony and the two witnesses, Nelson and Wheeler, who saw Griffin's car at Bush's apartment complex close to midnight. Appellant was sweating and "unkempt" while at Bush's apartment. Further, Appellant and Bush gave conflicting testimony as to what clothes he wore on Thursday night. Again, the weight to give the contradictory evidence as to Appellant's whereabouts on Thursday night, and what he wore, is within the sole province of the jury. *See id.*

We turn now to Appellant's mother's claim that they were together on the evening of the murder, at and after sundown. Even if this is true, it does not speak to exact times. Other evidence placed Appellant with Bush between 9:30 and 1:00, talking to Griffin in her home at some point between 9:45 and 10:30, and at Bush's apartment between 11:45 and midnight. Without a more definite time frame, Margie Jackson's claim does not actually tend to disprove guilt. Further, her claim that Appellant borrowed her truck that night conflicts with his statement that he did not have access to a vehicle on Thursday night and with his two different statements to Bush about how he arrived at her apartment.

Regarding Appellant's attempt to show that someone else may have been the murderer, the evidence does not show that the three men he offered up were viable suspects. The State showed that it investigated Mosley and Frances Johnson and determined that they had alibis. There was no evidence linking Williams to the murder. The jury, as the sole judge of the credibility of the witnesses and the weight to be given the evidence, could have disregarded Appellant's evidence as weak and unpersuasive. *See Reeves,* 969 S.W.2d at 479. Accordingly, we cannot say that we should disturb the jury's failure to give weight to Appellant's allegation that he could not be the murderer because someone else was the murderer.

Although Appellant tried to discredit the evidence against him, the jury could have chosen to believe the testimony of the State's witnesses and disbelieve the inferences Appellant raised. Considering all

the evidence, comparing the weight of the evidence tending to prove guilt with the evidence tending to disprove it, we conclude that the jury's determination on the issue of guilt is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Santellan,* 939 S.W.2d at 164; *Clewis,* 922 S.W.2d at 129. The verdict is not manifestly unjust, but rather, is supported by factually sufficient evidence. *See Cain,* 958 S.W.2d at 407. Accordingly, we overrule Appellant's issue two.

■ In his third, fourth and fifth issues, Appellant asserts that the trial court erred in refusing to allow him to attempt to impeach Kenneth Snow and establish Snow's bias. He contends this violated his rights under the confrontation clause of the Sixth Amendment to the United States Constitution and article one, section ten of the Texas Constitution. The trial court refused to allow Appellant to introduce a letter Snow had written to his attorney allegedly regarding his expectation of making a deal with the State in exchange for his testimony against Appellant. Appellant asserts that Snow did not claim that the letter was protected by his attorney-client privilege, the privilege cannot be claimed by anyone other than the client or the attorney, including the District Attorney, and a privilege cannot be used to perpetrate a fraud on the court.

After Snow testified that he expected no consideration for his testimony, Appellant attempted to impeach Snow with a letter Snow had written to his attorney.[1] Appellant offered the letter as Defense Exhibit 17. The State objected to any use of the letter, asserting that the letter is a privileged communication between Snow and his attorney. Outside the presence of the jury, when asked by the court whether he wanted to claim an attorney-client privilege regarding the letter, Snow said he wanted his attorney to answer that for him. Snow's attorney was not present in the courtroom at that time. The court refused to allow the defense to pursue the matter further without evidence that the attorney-client privilege had been previously waived with regard to the letter. The court instructed the jury to disregard any comments or questions about Defense Exhibit 17 and ordered it sealed.

Later in the proceedings, and outside the presence of the jury, Snow's attorney told the court unequivocally, "We have not waived the attorney-client privilege. We have not intended to waive the attorney-client privilege." Because Appellant still did not have evidence that the attorney-client privilege was waived, the court still refused to allow Appellant to use the letter, which remains sealed.

■ The determination of admissibility of evidence is within the sound discretion of the trial court. *Jackson* v. *State,* 575 S.W.2d 567, 570 (Tex. Cr.App. [Panel Op.] 1979). That determination will not be reversed on appeal unless a clear abuse of discretion is shown. *Werner v. State,* 711 S.W.2d 639, 643 (Tex.Cr.App.1986). Generally, great latitude should be allowed a defendant in showing any fact tending to establish ill feeling, bias, motive, and animus on the part of any witness against him. *Paley v. State,* 811 S.W.2d 226, 228 (Tex.App.—Houston [1st Dist.] 1991, pet. ref'd) (on reh'g).

■ The attorney-client privilege prohibits disclosure of confidential communications made for the purpose of facilitating the rendition of professional legal services to the client. Tex.R. Evid. 503(b)(1). The privilege is an exclusionary rule of evidence. *Strong v. State,* 773 S.W.2d 543, 547 (Tex.Cr.App.1989). Discussions regarding plea bargains are confidential communications protected by the attorney-client privilege and may not be disclosed without the client's permission. *Monreal*

---

1. Appellant presented no explanation as to how he came to possess the letter, which was a copy, not the original.

*v. State,* 947 S.W.2d 559, 567 n. 3 (Tex.Cr. App.1997) (Baird, J., concurring and dissenting). The privilege may be claimed by the client, or by the attorney on the client's behalf. TEX.R. EVID. 503(c). The power to waive the attorney-client privilege belongs to the client, or his attorney or agent, both acting with the client's authority. *Carmona v. State,* 941 S.W.2d 949, 953 (Tex.Cr.App.1997). The party seeking to benefit by a finding of waiver has the burden of going forward with evidence supporting such a finding. *Id.*

The letter Appellant sought to admit is a confidential communication written by Snow to his attorney for the purpose of facilitating the rendition of legal services to Snow and is protected by the attorney-client privilege. *See* TEX.R. EVID. 503(a)(1); *Monreal,* 947 S.W.2d at 567 n. 3. Here, Snow's attorney specifically stated that his client did not waive the attorney-client privilege with regard to the letter. Appellant brought forward no evidence that Snow had indeed waived his privilege with regard to the letter. As the letter Appellant attempted to admit into evidence is protected by the attorney-client privilege between Snow and his attorney, it is not admissible. Accordingly, the trial court did not abuse its discretion in refusing to admit the letter. We overrule Appellant's issues three, four, and five.

■ In issues six and seven, Appellant asserts that the trial court erred in excluding certain testimony of Clinton Johnson in violation of several of his constitutional rights. During the State's case, Kenneth Snow testified that Appellant attempted to persuade an inmate nicknamed Louisiana to testify falsely for Appellant. Appellant called Clinton Johnson, nicknamed "Louisiana," to testify. On direct examination, in an attempt to attack Snow's credibility, counsel for Appellant asked Johnson if Appellant had ever asked him to lie about anything in court. Although Johnson answered "no, sir" before the State lodged its objection, the court sustained the objection and instructed the jury to disregard. On

redirect, Appellant's counsel asked, "No one tried to get you to lie about anything?" Johnson replied, "No, sir. I have no reason to lie." Counsel immediately again asked, "No one asked you to lie about anything?" Johnson again replied, "No, sir." The State did not object to this testimony.

The testimony Appellant was precluded from introducing on direct examination of Johnson, which is the basis of his complaints in issues six and seven, came in without objection on redirect. Johnson's testimony that no one asked him to lie was before the jury. The jury was then left to determine who was more credible, Snow or Johnson. Accordingly, Appellant got what he asked for and has nothing to complain about on appeal with regard to Johnson's testimony. *See Cook v. State,* 858 S.W.2d 467, 473 (Tex.Cr.App.1993) (When appellant has been given all the relief he requested at trial, there is nothing to complain of on appeal.). We overrule Appellant's issues six and seven.

We *affirm* the trial court's judgment.