In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-02-00176-CR
______________________________


WILLIAM HARRIS, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 232nd Judicial District Court
Harris County, Texas
Trial Court No. 876384


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          A jury found William Harris guilty of murdering his estranged wife, Wenona


 Lynn
Harris, and assessed punishment at sixty-five years' imprisonment and a $10,000.00 fine. 
Harris raises three points of error on appeal: (1) factual sufficiency; (2) the admission of
hearsay evidence; and (3) the trial court's failure to hold a hearing on the admissibility of
expert testimony. We affirm the judgment.
I. Factual Sufficiency
          In his first point of error, Harris challenges the factual sufficiency of the evidence. 
Harris contends a reasonable alternative hypothesis exists that "is congruent with the
evidence and explains appellant's actions." He then suggests that, when examining the
factual sufficiency of the evidence, "it is instructive to remove the hypothesis urged by the
State and to examine the remaining evidence." Then, after conducting such a review,
Harris urges us to conclude "[i]t would be manifestly unjust to uphold [his] conviction on the
basis of evidence that can lead to the reasonable conclusion appellant did not commit the
offense." 
          A. The Standard of Review and the "Alternative Hypothesis Analytical Construct"
          The Texas Court of Criminal Appeals has never formally approved the "alternative
hypothesis analytical construct" as it relates to factual sufficiency claims. In Geesa v.
State, 820 S.W.2d 154, 159 (Tex. Crim. App. 1991), overruled on other grounds, Paulson
v. State, 28 S.W.3d 570 (Tex. Crim. App. 2000), the Texas Court of Criminal Appeals
expressly disavowed the "reasonable hypothesis analytical construct" for legal sufficiency
reviews. The Texas Court of Criminal Appeals next discussed the doctrine in Wilson v.
State, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999), but noted Wilson had failed to cite any
alternative hypothesis in his brief. The court then conducted a traditional factual sufficiency
review, found there to be no "evidence of significant value exculpating appellant from the
murder," and held appellant's conviction was not "against the overwhelming weight of the
evidence." Id. at 142.
          Several intermediate appellate courts of this State have expressly approved use of
the alternative hypothesis analytical construct within the framework of a factual sufficiency
review. In Richardson v. State, 973 S.W.2d 384 (Tex. App.—Dallas 1998, no pet.), the
Fifth Court of Appeals noted that Geesa's rejection of the "reasonable hypothesis analytical
construct" preceded the Texas Court of Criminal Appeals' adoption of a factual sufficiency
review standard in Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996). The Dallas
court then recognized that, because Clewis requires a factual sufficiency analysis to
consider all available evidence, an appellate court's analysis must include consideration
of a reasonable alternative hypothesis. Nonetheless, the Fifth Court quickly warned that
an appellate court "cannot reverse the verdict if reasonable minds could differ about the
conclusions to be drawn from the evidence." Richardson, 973 S.W.2d at 387. "A verdict
may be overturned only if it is so contrary to the overwhelming weight of the evidence as
to be clearly wrong and unjust."


 Id. Ultimately, the Richardson court found that ample
evidence supported Richardson's conviction, such that the jury's verdict was not manifestly
unjust or against the great weight of the evidence. Id. 
          In Warren v. State, 91 S.W.3d 890 (Tex. App.—Fort Worth 2002, no pet.), the
Second Court of Appeals acknowledged that the standard for reviewing factual sufficiency
is the same in both direct and circumstantial cases: the reviewing court examines all the
evidence in a neutral light and weighs the evidence both for and against the verdict. Id. at
892. The Second Court found there was sufficient evidence to exclude Warren's
alternative hypothesis that his brother, rather than Warren himself, committed theft by
passing worthless checks written on Warren's account. Id. at 896. The Fort Worth court
then affirmed Warren's conviction.
          In Ates v. State, 21 S.W.3d 384 (Tex. App.—Tyler 2000, no pet.), the Twelfth Court
of Appeals adopted Richardson's analysis for reviewing factual sufficiency when the
appellant raises a reasonable alternative hypothesis. "Because we consider all of the
evidence in conducting a factual sufficiency review, we necessarily consider any
reasonable alternative hypotheses raised by the evidence." Id. at 391 (citing Richardson,
973 S.W.2d at 387). And, like the Fifth Court's opinion in Richardson, Ates acknowledged
that mere existence of a reasonable alternative theory did not automatically render the
evidence insufficient. Id. (citing Richardson, 973 S.W.2d at 387). Weighing the evidence
proving Ates' guilt in the murder charge against the evidence disproving guilt, the Twelfth
Court held the jury could have disregarded Ates' evidence regarding the other possible
murder suspect as weak and unpersuasive. Id. at 392–93. Accordingly, the Twelfth Court
affirmed Ates' conviction. Id.
          We now turn to the case before us. The State cites our decision in White v. State,
58 S.W.3d 183 (Tex. App.—Texarkana 2001, no pet.), as precedent that "this Court has
[previously] refused to utilize the reasonable hypothesis test in reviewing a challenge to the
factual sufficiency of the evidence." In a combined, single point of error, the appellant in
White challenged both the factual and legal sufficiency of the evidence.


 Id. at 186–87. 
Analyzing both issues under a single section of analysis, we stated that the "other
reasonable hypothesis" test is no longer used and cited Brown v. State, 911 S.W.2d 744
(Tex. Crim. App. 1995), and Roberts v. State, 963 S.W.2d 894, 898 (Tex.
App.—Texarkana 1998, no pet.), for support. Like Geesa, Brown's rejection of the
alternative hypothesis analytical construct predates the Texas Court of Criminal Appeals'
opinion in Clewis. Moreover, Judge Meyers' opinion in Brown focused on legal sufficiency
within the context of a circumstantial evidence case. Brown, 911 S.W.2d at 744–49. In
Roberts, 963 S.W.3d at 897–99, we examined the factual and legal sufficiency of the
evidence to affirmatively link the appellant to over 400 grams of cocaine. We did not
disavow the applicability of the reasonable hypothesis analytical construct within a factual
sufficiency review; instead, we found that the affirmative links between the appellant and
the drugs "need not be so strong that it excludes every other reasonable hypothesis except
the defendant's guilt" as long as the circumstantial evidence provided "adequate affirmative
links between Roberts and the cocaine," and we held the evidence did so provide. Id. at
898, 899. Accordingly, in contrast to the State's contention, we do not read our precedent
to foreclose consideration of Harris' point of error under Richardson's alternative
hypothesis analytical construct. Consideration of a reasonable alternative hypothesis is
consistent with the scope of our duty to review all the evidence in a neutral light during a
factual sufficiency review. Such an analytical construct has not been forbidden by the
Texas Court of Criminal Appeals, and it is not inconsistent with this Court's own
jurisprudence.
          However, asking us to ignore the State's hypothesis and examine only part of the
evidence—as is now urged by Harris in the case before us—is not the proper standard
under which to review factual sufficiency. We are required to examine all the evidence in
a neutral light. Clewis, 922 S.W.2d at 129. As the Dallas Court of Appeals explained in
Richardson,
a reviewing court conducting a factual sufficiency analysis necessarily
considers any reasonable alternative hypotheses raised by the evidence. 
The very nature of a factual sufficiency review requires the court to consider
all of the evidence presented at trial and not just that which is favorable to
the verdict. Therefore, if the evidence suggests the existence of a
reasonable alternative hypothesis, the court cannot ignore it and still properly
perform the analysis required under Clewis. However, the mere existence
of an alternative reasonable hypothesis does not render the evidence
factually insufficient. . . . [E]ven when an appellant identifies an alternative
reasonable hypothesis raised by the evidence, the standard of review
remains the same. A verdict may be overturned only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.
 
973 S.W.2d at 387 (citation omitted); see also Ates, 21 S.W.3d at 391. We decline Harris'
invitation to apply a different standard of review. Cf. Swearingen v. State, 101 S.W.3d 89,
97 (Tex. Crim. App. 2003) (view all evidence, both for and against jury's verdict); Goodman
v. State, 66 S.W.3d 283, 285–86 (Tex. Crim. App. 2001) (factual sufficiency review
involves balancing all evidence, i.e., weighing testimony of Cretan Liar against that of one
or more boy scouts).
          B. The Indictment and Evidence
          The indictment charged Harris with murdering Wenona by strangulation. A person
commits murder when he or she intentionally or knowingly causes the death of another
person. Tex. Pen. Code Ann. § 19.02(b)(1) (Vernon 2003). The case against Harris was
based on circumstantial evidence; no one who testified saw Wenona killed. It is the
circumstantial evidence that Harris contends is factually insufficient.
          The evidence, viewed in a neutral light, shows the following: Police found a
woman's body on the early afternoon of Sunday, March 4, 2001. The body was located
behind a trash dumpster near the former headquarters of the old Dryper's diaper
corporation in north Houston. The body was that of a black female, not wearing shoes, her
belt undone, and her pants partially unzipped. Police found no blood around the body. 
The woman was ultimately identified as Wenona Harris. 
          Roger Milton, M.D., an assistant medical examiner at the Harris County Medical
Examiner's office, performed the autopsy. He concluded Wenona died as a result of
strangulation. 
          Before her death, Wenona lived in Texas City, Texas. Rashand Malvo was
Wenona's neighbor at the Lakewood Apartments. Malvo testified he believed Wenona
lived in her apartment with her son and Harris. Malvo stated he saw Harris leave
Wenona's apartment between 11:30 and 11:40 a.m. Saturday, March 3, 2001. A few
moments later, Malvo saw Harris again, this time as he was being shown around the
apartments by a leasing agent. Malvo also testified he remembered Harris drove a black
Lincoln Navigator sport utility vehicle. 
          Evangeline Blevins, a leasing agent who worked at the Lakeview Apartments at the
time of Wenona's murder, testified she showed an African-American male around the
complex Saturday, March 3, 2001. At trial, Blevins could not independently remember the
name of the man to whom she had shown the apartment, but did identify the person shown
on Harris' driver's license as the same person to whom she had shown the apartment.


 
That man had specifically asked to see apartment number 1808, located next door to
Wenona's apartment. Eventually, the man left a deposit check with Blevins for apartment
number 1808. That deposit check—admitted into evidence at trial—was drawn on a bank
account belonging to "William Harris." On Monday, March 5, 2001, Blevins received a call
from the man to whom she had leased apartment 1808; he said he no longer wanted the
apartment. 
          Misty and Betty Leiber testified they had driven to the Lakeview Apartments in Texas
City to pick up a friend for lunch Saturday, March 3, 2001. They arrived between 2:30 p.m.
and 3:00 p.m. While they waited for their friend, both observed an African-American male
coming down the walkway in front of their friend's apartment. (Betty testified she thought
the man was approximately six feet tall.)


 Both Misty and Betty initially thought the man
was doing laundry because they observed him carrying what looked like a big bundle of
laundry inside either sheets or a large comforter over his right shoulder. But as they
watched the man, Misty and Betty saw a human arm extend from the bundle. Through the
linens, Betty and Misty thought they saw a body clothed in a dark-colored or striped shirt.


 
Misty believed the arm was that of "either a small black woman or a bigger child that was
Hispanic or black, . . . ." Betty described the arm as thin and darkly tanned. "It could have
been like a light-skinned black person or Mexican. I couldn't really tell." Betty also said
she believed the arm was that of either a woman or a child. 
          Misty saw the man put the bundle into a vehicle she described as a dirty, black sport
utility vehicle. Before the SUV sped away from the scene, Misty wrote down the SUV's
license plate number, 4TPJ44. Misty said she saw "the back of the [body's] head hit the
window with the arm up" when the man put the body into the SUV. "But he [the driver]
pulled it [the arm] down to where it wasn't there anymore." At trial, Misty identified Harris
as the man she had seen carrying what she thought was a body wrapped inside the sheets
or comforter. Betty, however, was unable to identify Harris, during either a lineup at the
police station or later at trial, as the man she saw carrying the bundle.


 But when asked
repeatedly at trial, Betty was certain she never saw a child with the man who she had seen
carrying the body and who drove away in the black SUV. 
          Misty and Betty went to lunch, then went to the Texas City Police Department to
report the suspicious activity they had observed earlier at the Lakewood Apartments. The
next day, someone from the police department followed up on Betty's and Misty's
information. At that time, Misty gave Officer Brian Goetscheius the piece of paper on
which she had written the black SUV's license plate number. This paper was later admitted
into evidence. The paper shows a handwritten notation of "4tP J44." 
          Sergeant Robert Elliot of the Texas City Police Department testified a man named
"William Harris" was the registered owner of a black Lincoln Navigator SUV with license
plates 4TPJ44. Elliot also told the jury about his search of Harris' SUV. Using Luminol,



Elliot found evidence of blood on the floor mats. He collected the floor mats and submitted
them to the forensics laboratory of the Houston Police Department for further testing. 
Elliot, however, did not know whether the floor mats ever received further testing at the
Houston Police Department. Regardless, the State presented no evidence of such an
analysis.


 Elliot also found no evidence of the victim's hair or fingerprints inside Harris'
SUV. 
          At 4:00 p.m. Saturday afternoon, Harris took his son Jyron to Lucy Smith's home in
Galveston.


 Harris left Jyron in Smith's care.


 Smith said Harris told her the following
morning he had gone to Houston to drop something off. Later that day, Smith and Jyron
went to eat with Cardena Fontenette (Smith's daughter) at a local restaurant. Smith told
the jury she did not believe Harris had been behaving unusually during the weekend
Wenona was killed. 
          Fontenette testified Harris came to see her at work the afternoon of Sunday,
March 4, 2001. Harris arrived in his Lincoln Navigator and asked to use Fontenette's
vehicle. Harris said he needed to go to Galveston and see what was happening regarding
Wenona. He also told Fontenette he had a warrant out for his arrest. Fontenette allowed
Harris to exchange his Navigator for her car, as it had been their custom to share vehicles
in the past. 
          Harris left, but later used his cell phone to call Fontenette. During that call,
Fontenette informed Harris that the police were looking for him at his home and that Harris
should go speak with them. Harris told Fontenette he would talk to the police. Fontenette
then went to Galveston, picked up Jyron, and took him to the police station. Fontenette
then left the Lincoln Navigator at a friend's home. 
          At trial, Fontenette said Harris had told her that he had been to the casino in
Louisiana Saturday night and that, based on his physical appearance, she believed the
story was consistent with his physical appearance. She also said Harris had consistently
denied being involved in Wenona's death. 
          Another witness, Mary Jackson,


 testified that, before Valentine's Day 2001, Harris
told her he was going to ask one of the deputy sheriffs to lock him up so he would not be
able to harm Wenona. Jackson later found out Harris admitted himself to the psychiatric
unit of a hospital because he was having homicidal thoughts. 
          Ifeoma Arena, M.D., a resident in psychiatry at the University of Texas Medical
Branch (UTMB) in Galveston, interviewed Harris February 12, 2001, when he admitted
himself to that facility. Harris told Arena he had been having thoughts of killing Wenona
by strangulation or by shooting her with a gun. He said he could snap at any time. He also
told Arena he spent most of his day following Wenona, watching her, and checking on
where she was going. Harris was upset that Wenona had a new boyfriend. Arena recalled
Harris saying he had a key to Wenona's apartment. Even though Harris presented no
acute psychosis, Arena admitted Harris for depression and further evaluation. Harris'
medical records, admitted into evidence without objection, indicate he was admitted to the
psychiatric unit for "suicidal and homicidal precautions." 
          Vanessa Vela, M.D., another psychiatry resident at UTMB-Galveston, saw Harris
February 13, 2001. Harris saw Vela and her team (including two medical students and a
faculty physician) and seemed "mildly distressed." Harris stated he admitted himself to the
hospital the previous day due to concerns about (1) his pending divorce; (2) the fact his
wife was dating another man; and (3) thoughts of arming himself and hurting his wife. But
on February 13, 2001, Harris reported he was no longer having those thoughts. Vela
stated the overnight change in Harris' demeanor was consistent with her experience: "a
lot of patients, once they are in the safety of the hospital, they do realize these thoughts
are irrational and they are able to kind of think things through in a quiet, structured
environment a long time." Harris' change was not the result of having been administered
any medication. Vela concluded, based on her observations, the patient interview, and
Harris' psychiatric history, that Harris was not psychotic. He appeared intelligent, articulate,
capable of conversing, completely rational, and able to understand Vela's questions. 
When Vela told Harris that his soon-to-be ex-wife was not interested in being a part of his
psychiatric treatment, Harris said he was disappointed. Vela prescribed Paxil for Harris'
treatment. According to Vela, Paxil usually takes four to six weeks to take effect and does
not work for everyone. Harris then checked out of the hospital.
          When Jackson found out Harris had left the hospital, she called Wenona to warn
her because Jackson feared "he [Harris] might try to hurt her [Wenona]." 
          Testifying before the jury, Lashuana Hampton


 described Wenona as a woman with
a thin build and a lighter skin complexion.


 Hampton testified about several incidents of
family violence in which Harris injured Wenona. These injuries included a black eye,
bruises on Wenona's arms, and marks on Wenona's neck and back where Harris had
scratched her. Hampton also told the jury that Harris had previously choked Wenona until
she passed out and that he had struck her with a telephone. 
          Wenona had called Hampton during the early morning of Saturday, March 3, 2001. 
Wenona wanted to bring Jyron to stay with Hampton. She arrived at Hampton's house
around 8:00 a.m., and Jyron stayed with Hampton until around 12:50 p.m. when Wenona
returned to pick up Jyron. At that time, Wenona was wearing a dark brown or dark black
shirt made of stretchy material. Hampton, Hampton's husband, and Wenona then took a
table to Wenona's apartment. Hampton left Wenona's apartment around 2:00 p.m., when
Wenona planned to take a bath. Hampton later returned to Wenona's apartment and
knocked on the door, but neither Jyron nor Wenona answered. Hampton waited
approximately ten minutes, but no one answered the door during that time. She called
Wenona's home telephone number around 4:00 p.m. and again at 10:00 p.m., but received
no answer. 
          The victim's mother, Norsie Young, testified she last spoke with Wenona at 12:52
p.m. Saturday, March 3, 2001. Young and Wenona had agreed to join other family
members later that evening to celebrate Wenona's twenty-ninth birthday. At 2:49 p.m.,
Harris called Young to tell her he was taking Jyron to Cardena's house and then heading
to Coushatta, Louisiana, to gamble. 
          Wenona never arrived at the family celebration that evening. Young and Wenona's
other family members became concerned about Wenona's unexplained absence and
began searching for her. Young and her son went to Wenona's apartment that evening,
but found neither Wenona nor Jyron, and they found no signs of a struggle at the
apartment. Young, however, believed it was strange that her daughter's car was still
parked in the parking lot when Wenona was not at home. 
          Young called Harris Sunday morning regarding Wenona's disappearance. Harris
denied knowing Wenona's whereabouts. Young later called Harris a second time and told
him the police were looking for him because two of Wenona's neighbors had seen Harris
allegedly carrying Wenona, wrapped in a sheet, from her apartment when Wenona's arm
protruded from the sheet. According to Young's testimony, Harris denied being at
Wenona's apartment, questioned whether the neighbors had actually seen Harris at
Wenona's apartment, and eventually agreed to meet Young at the Texas City Police
Department. Harris, however, never showed up at the police station. 
          During the evening of Sunday, March 4, 2001, police were asked to go to Wenona's
apartment regarding a missing person's report. Once there, police gained entry through
the assistance of a family member and "processed" Wenona's apartment. They found no
sign of a forced entry. They did find blood on some bed sheets, but the police later
concluded this blood was consistent with menstrual blood. 
          On the evening of Saturday, March 3, 2001, Donney Caraway and Elicia
Washington were waiting for a bus in north Houston to take them to a Louisiana casino. 
After 9:00 p.m., Harris arrived at the pickup point for the bus and joined Caraway,
Washington, and the other riders for the trip to the casino. The bus left around 9:45 p.m. 
The group rode to the casino, gambled, and returned several hours later. Washington and
Caraway described Harris as not being as lively as he had been on previous trips with
them, but neither detected anything too unusual about his demeanor. 
          C. Analysis
          Harris contends it is just as plausible that the person Misty and Betty saw Harris
taking away from Wenona's apartment was Jyron. It is true that both Misty and Betty
described the arm they saw extending from the sheet as belonging to a small woman or
a child. However, there was also evidence that Harris had been stalking Wenona for quite
some time, that he had assaulted and choked her in the past, that he had recent homicidal
thoughts that were so severe they prompted Harris to commit himself to a psychiatric
hospital, and that he had been seen at the apartment complex by several different people
that day despite having initially denied being at Wenona's apartment. Even absent those
factors, the jury could have reasonably rejected Harris' alternative hypothesis that he took
his son to the truck by wrapping the child inside a bed sheet and carrying the bundle (with
child inside) over his right shoulder like a bag of laundry, especially when there was no
testimony the child had difficulty walking on his own later that same evening when he went
to eat with his half-brother's mother at a local restaurant. After reviewing all the evidence,
we cannot say the jury's conclusion that Harris was the person who killed Wenona is
against the great weight of the evidence or that his conviction is manifestly unfair or unjust. 
We overrule Harris' first point of error.
II. Hearsay
          In his next point of error, Harris contends the trial court erred by permitting two
witnesses to testify about statements the victim made before her death about Harris'
potential for domestic violence. First, while watching a murder trial involving domestic
violence, Wenona became very emotional and confided in her supervisor, Latonia Wilson,
that Wenona believed Harris would kill her. Second, during an interview for a protective
order against Harris, Wenona told Ella Anderson, an assistant criminal district attorney
from Galveston County, about prior occasions when Harris had assaulted her in the
couple's household. Harris argues the two statements admitted by the trial court did not
fall within the excited utterance exception to the hearsay rule. 
          We may not reverse a trial court's decision to admit evidence under an exception
to the hearsay rule, including the excited utterance exception, unless a clear abuse of
discretion is shown. Zuliana v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). An
abuse of discretion occurs only when the trial court's decision "was so clearly wrong as to
lie outside that zone within which reasonable persons might disagree." Id. (quoting Cantu 
v. State, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)). 
          "'Hearsay' is a statement, other than one made by the declarant while testifying at
the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex. R.
Evid. 801(d). Hearsay is not admissible except as provided by statute or by the Texas
Rules of Evidence. Tex. R. Evid. 802. "A statement relating to a startling event or
condition made while the declarant was under the stress of excitement caused by the event
or condition" is not excluded by the hearsay rule. Tex. R. Evid. 803(2). This exception is
called the "excited utterance" exception. For the excited utterance exception to apply,
three requirements must be shown:
(1) the statement must be the product of a startling occurrence that produces a
state of nervous excitement in the declarant and renders the utterance spontaneous
and unreflecting,
 
(2) the state of excitement must still so dominate the declarant's mind that there is
no time or opportunity to contrive or misrepresent, and
 
(3) the statement must relate to the circumstances of the occurrence preceding it.
 
Sellers v. State, 588 S.W.2d 915, 918 (Tex. Crim. App. [Panel Op.] 1979); Harvey v. State,
No. 06-02-00061-CR, 2003 WL 22722873, at *5 (Tex. App.—Texarkana Nov. 20, 2003,
pet. filed). It is the absence of opportunity for reflection and fabrication—an opportunity
lost because the declarant is in the grips of overwhelming emotion—that forms the basis
for the excited utterance exception. Zuliana, 97 S.W.3d at 595. "In other words, the
statement is trustworthy because it represents an event speaking through the person rather
than the person speaking about the event." Id. 
          With respect to the first statement, Wenona had been working as an in-court deputy
district clerk, under Wilson's supervision, during a murder trial in which a husband killed
his wife during a domestic dispute. After listening to the evidence in the case, Wenona
began to cry. Wilson said Wenona became "absolutely" overwhelmed with emotion and
very upset during the presentation of evidence. Wilson observed Wenona shaking in
conjunction with her emotional state. In fact, Wenona had to leave the trial three or four
times because "it got too hard for her." When Wenona left the first time, Wilson went with
her, and Wenona confided in Wilson that she was upset because she believed Harris
would kill her. 
          At trial, Harris objected to Wilson's testimony about Wenona saying she feared
being killed by Harris. Harris objected on the basis that the statement's genesis was not
from emotion or undue stress. On appeal, the State contends trial counsel's objection was
insufficient to preserve the issue now raised on appeal by Harris. We disagree. Given
both the context of Wilson's entire testimony and the prosecutor's explicit offering of the
evidence pursuant to the excited utterance exception to the hearsay rule, we believe trial
counsel's objection was sufficiently tailored to provide the trial court with notice of the issue
being raised and was therefore sufficient to preserve it for our review on the basis now
presented on appeal.
          The startling event that triggers an excited utterance need not necessarily be the
crime itself. Hunt v. State, 904 S.W.2d 813, 815–16 (Tex. App.—Fort Worth 1995, pet.
ref'd). In Hunt, a child victim had been sexually assaulted by her father's friend. Three
months later, while watching a television show about a young rape victim, she began to cry
uncontrollably and told her mother what had happened. Id. at 815. The Second Court of
Appeals upheld the trial court's admission of the excited utterance on the basis that "the
shock of seeing the television news program . . . triggered K.S.'s fear of pregnancy and the
ensuing out-of-court statements." Id. at 816. The Hunt court further noted that the
evidence showed the utterance "was made before there was time to misrepresent and that
it [the statement] related to the circumstances of the occurrence preceding it." Id. at
816–17.
          In the case now before us, Wilson testified Wenona was completely overwhelmed
by her emotions as a result of hearing the evidence during the murder trial. Wenona made
the statement to Wilson when they left the courtroom after Wenona first became upset
from observing the testimony in the murder case, and it is clear from Wilson's testimony
that it was watching the events in the courtroom that triggered Wenona's emotional state. 
From the evidence in this case, we believe the trial court could have reasonably concluded
Wenona was not able to reflect or fabricate such a reaction to the testimony and was under
the excitement and stress of the events in the courtroom when she spoke, even though the
events in question occurred several months before the time Wenona made the statements.
Cf. Apolinar v. State, 106 S.W.3d 407, 417–19 (Tex. App.—Houston [1st Dist.] 2003, pet.
granted) (passing of time between assault and excited utterance did not convert statement
into hearsay when evidence showed utterance was made when victim had not had
opportunity to reflect or fabricate). Accordingly, we cannot say the trial court acted outside
the zone of reasonable disagreement in permitting Wilson to testify about Wenona's
statement to her.



          With respect to the second statement, Anderson testified to the following during the
State's case-in-chief:
[Anderson:] I was asking her [Wenona] who she was applying for a
protective active order against and why.
 
[Prosecutor:] And what did she explain to you?
 
[Anderson:] She said she was applying for a protective order to
protect her from her husband, William Harris. I believe she told me she had
filed a divorce action against him and that was pending but not final at that
time. She said that he had committed an act of violence, act of physical
violence against her. She said [that] she was very afraid of him. She said
that in addition to the act of violence he had committed against her that he
had also threatened her, that he had admitted himself to a psychiatric facility
because he was afraid of hurting her, these sort of things.

(Emphasis added.) Anderson then explained that Wenona appeared very upset and cried
during the interview. 
          Nonetheless, the evidence showed Wenona had taken her own initiative in seeking
the protective order from Anderson's office. This shows Wenona had given the matter
some degree of reflection and thought. We cannot say Wenona's statement to Anderson
is inherently trustworthy because it is not clearly the product of "an event speaking through
the person rather than the person speaking about the event." Zuliana, 97 S.W.3d at 595. 
We hold the trial court abused its discretion by admitting the statement under the excited
utterance exception.
          Having found the trial court erred by admitting Anderson's testimony over Harris'
proper hearsay objection, we must determine whether the error was harmful. Tex. R. App.
P. 44.2. The erroneous admission of evidence is nonconstitutional error, for which we
review harm under Rule 44.2(b) of the Texas Rules of Appellate Procedure. We are not
to reverse a criminal conviction unless, after examining the record as a whole, we have fair
assurance that the error did influence the jury or had more than a slight effect. Tex. R.
App. P. 44.2(b); Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). 
          In this case, Anderson did not testify about the specifics of the assaultive offense
that prompted Wenona to seek a protective order from her office. Another witness,
however, did inform the jury about such specifics. Hampton testified that, over a period of
three years, Harris assaulted Wenona on several occasions. In 1997, Harris threw a
telephone at Wenona. In 1998 or 1999, Harris hit Wenona with a telephone, causing a
black eye. Hampton also recalled a separate occasion when she saw Wenona with
bruises on her neck where Harris had choked her. On appeal, Harris neither contends the
trial court erred by admitting Hampton's testimony, nor did he specifically object to that
evidence at trial. Thus, in light of Hampton's more detailed testimony, we cannot say the
erroneous admission of Anderson's otherwise generic description of the prior assault
influenced the jury's verdict or had more than a slight effect, if any at all. We overrule
Harris' second point of error.
III. Expert Testimony
          In his third point of error, Harris contends the trial court erred by failing to hold a
hearing on the admissibility of expert testimony on the "cycle of domestic violence."


 The State responds that the trial court was not required to permit voir dire under Rule
705(b) of the Texas Rules of Evidence because Anderson did not testify as an expert. 
          A person who is qualified as an expert by knowledge, skill, experience, training, or
education may testify about scientific, technical, or other special knowledge that the trial
court finds will assist the trier of fact in understanding the evidence, or in determining a fact
in issue. Tex. R. Evid. 702.
Prior to the expert giving the expert's opinion or disclosing the underlying
facts or data, a party against whom the opinion is offered upon request in a
criminal case shall, or in a civil case may, be permitted to conduct a voir dire
examination directed to the underlying facts or data upon which the opinion
is based. This examination shall be conducted out of the hearing of the jury.
 
Tex. R. Evid. 705(b) (emphasis added). The rule is clear: if a criminal defendant requests
a hearing under Rule 705(b), the trial court must allow such an examination outside the
jury's presence before the expert gives further testimony in the jury's presence. Tex. R.
Evid. 705(b); Alba v. State, 905 S.W.2d 581, 587–88 (Tex. Crim. App. 1995). By contrast,
the rule regarding voir dire of experts in civil cases is permissive. The trial court errs if it
denies a timely request to voir dire an expert witness in a criminal trial. Alba, 905 S.W.2d
at 588. "In such a case, a reviewing court would then be required to decide whether the
trial judge's error was so harmful as to require reversal." Id.
          In Alba, the prosecution called a psychiatric expert during the punishment phase of
a capital murder trial. After the prosecutor qualified the witness as an expert and asked
a hypothetical question that took up thirteen pages of the reporter's record, the defendant,
for the first time, objected to the expert's testimony and requested a hearing outside the
jury's presence pursuant to Rule 705(b). The trial court denied the request. In reviewing
that denial on appeal, the Texas Court of Criminal Appeals noted, "The focus of Rule
705(b) is to prevent the jury from hearing the underlying facts and data which might
ultimately be ruled as inadmissible." The court then held that the purpose of the Texas
Rules of Evidence had been satisfied by the prosecutor's thirteen-page hypothetical and
by the fact that no improper evidence had been errantly disclosed to the jury. The Alba
court then held that the trial court did not err by denying the defendant's request for a Rule
705(b) hearing. Id. 
          At trial in the case now before us, Anderson explained her background as a
Galveston County assistant criminal district attorney (she heads a department that
prosecutes crimes of domestic violence and obtains protective orders on behalf of victims)
and as a registered nurse who worked for many years in the emergency room. Harris'
counsel then objected to Anderson's testimony. "Your Honor, she keeps going into
domestic violence. She has expert testimony on that. I think I'd like to have a Daubert
hearing to see whether she has scientific basis for that information." The trial court denied
Harris' request. Harris later issued a second objection to the prosecutor's continued
questioning of Anderson's anticipated testimony on the "cycle of violence." "Objection,
Your Honor, the predicate still hadn't been laid, no scientific basis thereof." The trial court
again overruled Harris' objection.
          The trial court permitted Anderson to testify in general terms about a theory that has
more commonly come to be referred to as "the cycle of domestic violence."


 The State
asked Anderson about the "cycle of violence" based on her "training and experience and
backgrounds in the area of domestic violence." It is clear from the record that the
prosecutor sought to demonstrate Anderson possessed specialized knowledge about
domestic violence. Such specialized testimony is the very essence of expert testimony. 
See, e.g., Burns v. Baylor Health Care Sys., No. 08-02-00159-CV, 2003 WL 22161590,
at *2-3 (Tex. App.—El Paso Sept. 19, 2003, no pet.) (analyzing whether proponent of
expert testimony carried burden to provide proof of expert's qualifications). Accordingly,
we do not agree with the State's suggestion on appeal that Anderson was testifying
exclusively as a lay witness.
          At this juncture, none of the data or facts underlying Anderson's testimony about the
"cycle of violence" were before the jury. This distinguishes this case from the situation
presented in Alba. In Alba, the defendant did not object until the "cat was already out of
the bag." Here, the "underlying facts and data which might ultimately be ruled as
inadmissible" were not yet before the jury. See Alba, 905 S.W.2d at 588. There is no
indication in the record Harris knew or could reasonably be expected to know "the
foundation of the expert's opinion." See id. Accordingly, we believe Harris' objection was
timely and the trial court had a mandatory duty to allow a voir dire examination outside the
jury's presence. See Tex. R. Evid. 705(b). The trial court abused its discretion by not
allowing Harris to voir dire Anderson regarding the underlying data or facts that formed the
basis of her testimony as an expert witness. We must now determine whether the error
is "so harmful as to require a reversal." Goss v. State, 826 S.W.2d 162, 168 (Tex. Crim.
App. 1992); see also Alba, 905 S.W.2d at 588 (suggesting in dicta that even had trial court
erred, such error was "clearly harmless"). 
          During the first six pages of her testimony, Anderson described her education, work
experience, and her observations regarding common characteristics exhibited by victims
of domestic violence. On a portion of the following page, she describes the "cycle of
violence" concept. After that, Anderson spends the next twenty-one pages of testimony
explaining how someone obtains a protective order through Anderson's office, and then
tells the jury what Wenona herself had done to apply for a protective order against Harris. 
          It is clear from the record that Anderson's general observations of domestic abuse
victims set a background for her later, more specific testimony, about Wenona going
through the process of obtaining a protective order. That general testimony was relevant
and probative because it aided the jury in understanding the process for obtaining such an
order. Cf. Scugoza, 949 S.W.2d at 363 (witness' "cycle of violence" testimony probative
and relevant because information assisted jury in understanding evidence). The purpose
of the short interchange about the cycle of violence was not, in light of Anderson's entire
testimony, to focus the jury's attention on some alleged pattern of continual violence by
Harris. And Anderson never applied the "cycle of violence" model to the facts of this case
so as to suggest Harris' behavior was consistent with a perpetrator of violence. Contrast
Alba, 905 S.W.2d at 588 (prosecutor asked expert to testify regarding opinions about case
based on evidence); Kelly v. State, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) (for novel
scientific evidence to be admissible, proponent must show reliability by, among other
things, showing technique was properly applied to occasion in question).  
          Anderson's testimony instead focused on patterns of response she had seen in
victims' behavior as those patterns relate to incidents when victims ultimately abandoned
pursuing the protective order. Anderson's testimony did not cross the line between
assisting the jury and attempting to replace the jury as trier of fact. Viewing Anderson's
testimony as a whole, we cannot say the trial court's failure to permit a Rule 705(b) hearing
"was so harmful as to require reversal." Cf. Jenkins v. State, 912 S.W.2d 793, 814 (Tex.
Crim. App. 1993) (trial court's noncompliance with Rule 705(b) harmless partially because
expert provided no damaging, inadmissible testimony in jury's presence). We overrule
Harris' third point of error.
 

IV. Conclusion
          For the reasons stated, we affirm the trial court's judgment.
 

                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      September 26, 2003
Date Decided:         February 18, 2004

Publish